UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| BENJAMIN MOSTAED on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>JAMES B. CRAWFORD, ROBERT H. FOGLESONG, RICHARD M. GABRYS, ROBERT B. HOLLAND, BOBBY R. INMAN, DAN R. MOORE, BAXTER F. PHILLIPS, JR., STANLEY C. SUBOLESKI, LINDA J. WELTY, MASSEY ENERGY COMPANY, and ALPHA NATURAL RESOURCES, INC.,<br><br>        Defendants. | Civil Action No.: 3:11-cv-00079-REP<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF §§ 14(a) AND 20(a) OF THE 1934 SECURITIES AND EXCHANGE ACT, AND FOR BREACH OF FIDUCIARY DUTY**<br><br>**DEMAND FOR JURY TRIAL** |

Pursuant to Fed. R. Civ. P. 15(a)(1), Plaintiff Benjamin Mostaed ("Plaintiff") files this First Amended Complaint as a matter of course. Plaintiff, individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to the allegations which pertain to Plaintiff, which allegations are based upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of the holders of Massey Energy Company ("Massey" or the "Company") common stock against certain of the Company's officers and/or directors (the "Board"). The action arises out of Defendants' efforts to sell Massey to Alpha Natural Resources, Inc. ("Alpha") in a cash and stock transaction in which Massey would survive as a wholly owned subsidiary of Alpha (the "Proposed Acquisition").

2.      To effectuate their goal, Defendants must secure shareholder approval.  Thus, on March 17, 2011, the Massey Board together with Alpha caused a materially false and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") and disseminated in connection with an upcoming special shareholder vote.  The preparation and dissemination of the false and misleading Proxy was intended to induce shareholder action which will result in substantial harm to Plaintiff and Massey's other shareholders.  Moreover, the dissemination of this false and misleading Proxy was in violation of §§ 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"), and SEC Rule 14a-9 promulgated thereunder.  After careful review of this false and misleading Proxy, Plaintiff acted as soon as practicable to bring this action properly before this Court – the only Court that may properly adjudicate claims arising under the 1934 Act.

3.      In addition, Defendants breached their fiduciary duties by agreeing to a transaction that is procedurally and substantively flawed, and will enrich the Individual Defendants (defined below) to the detriment of Massey's public shareholders.

4.      The Proposed Acquisition is the result of a flawed and unfair process and represents an unfair price of only 1.025 shares of Alpha common stock and $10.00 in cash for each outstanding share of Massey's common stock.  This Proposed Acquisition ratio constitutes just $69.33 per Massey share (based upon the closing price of Alpha stock as of January 28, 2011, the last trading day preceding the announcement of the Proposed Acquisition), a mere 16% premium over Massey's closing share price on January 12, 2011, over $22 per share *less* than the price at which Massey stock traded as recently as June 23, 2008.

5.      The Board, acting out of self-interest as detailed below, was aided and abetted by the Company and Alpha in connection with its directors' breaches of fiduciary duty.  Thus, the Company and Alpha are also named Defendants in this action.  In pursuing the unlawful Proposed Acquisition, each of the Defendants violated applicable law by directly breaching

and/or aiding the other Defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing.

6.      In pursuing this unlawful plan to divest the Company's public shareholders of their stock in the Company at an unfair price and through a flawed process, Defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted the other Defendants' breaches of fiduciary duty.  Instead of attempting to negotiate a transaction reflecting the highest price reasonably available for the Company's stockholders, Defendants spent substantial effort tailoring the Proposed Acquisition to meet their own specific needs and those of Alpha.  Indeed, the Proposed Acquisition extinguishes no fewer than eight derivative lawsuits currently pending against the Individual Defendants, and the Proposed Acquisition calls for Alpha to assume the liabilities of at least three other lawsuits currently pending against the Individual Defendants.

7.      Moreover, Defendants structured the Agreement and Plan of Merger (the "Merger Agreement") in such a manner as to all but ensure that Alpha's offer will not be credibly challenged.  The Merger Agreement contains onerous deal protection devices that discourage, and effectively operate to preclude, competing bids, thus severely undermining the ability of the Company to receive a superior proposal.  Specifically, as part of the Merger Agreement with Alpha, Defendants included an absolute "no solicitation" provision preventing the Individual Defendants from shopping the Company or soliciting competing bids in search of a superior proposal.  Worse, in the event an unsolicited superior proposal surfaces, if those shareholders vote the Proposed Acquisition down and then Massey subsequently agrees to merge with the superior bidder, Defendants agreed to pay Alpha a *$251 million* termination fee.  This termination fee will serve to chill the interest of any potential rival bidders, who likely will forego the time and expense of preparing a proposal that likely will not even be considered, given Defendants' likely reluctance to pay over a quarter billion dollar termination fee.  Thus, in derogation of their fiduciary duties, Defendants have agreed to severely discourage any superior

3

offers for the Company.   Accordingly, without intervention of the Court, the Proposed Acquisition is a *fait accompli*.

8.     Because Defendants dominate and control the business and corporate affairs of Massey and are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Massey, which makes it inherently unfair for them to execute and pursue any proposed merger agreement under which they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

9.     In short, the Proposed Acquisition is designed to unlawfully divest the Company's public stockholders of the valuable assets of the Company for grossly inadequate consideration. Defendants have acted to place their self-interests ahead of the interests of shareholders of Massey, and/or have aided and abetted therein.

10.    Plaintiff seeks injunctive relief to prevent Defendants from consummating the Proposed Acquisition unless and until the Defendants' breaches of fiduciary duty are rectified.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise in part out of the laws of the United States, § 27 of the 1934 Act, § 14(a) and § 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.   All of Plaintiff's claims arising under the 1934 Act are within the exclusive jurisdiction of this Court.   In addition, there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.   This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this

District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.     Plaintiff is, and at all relevant times was, a shareholder of Massey.  Plaintiff is a citizen of California.

15.     Defendant Massey is a Delaware corporation with its headquarters and principal place of business in Richmond, Virginia.  With operations in West Virginia, Kentucky and Virginia, Massey is the largest coal producer in Central Appalachia. Massey produces, processes and sells various steam and metallurgical grade coals through its 26 processing plants, docks and shipping centers and employs through its various subsidiaries more than 7,300 employees.

16.     Defendant Alpha is a Delaware corporation with its headquarters and principal place of business in Abingdon, Virginia.  Alpha is an American coal supplying and production company, with coal production capacity of greater than 90 million tons a year. The Company, through its affiliates, employs approximately 6,400 people and operates approximately 60 mines and 14 coal preparation facilities in Appalachia and the Powder River Basin.

17.     Defendant Baxter F. Phillips, Jr. ("Phillips") has been a director of Massey since May 22, 2007. He is a member of the Finance Committee, and has served as the Chief Executive Officer ("CEO") and President of Massey since December 2010.  Phillips is a citizen of Virginia.

18.     Defendant Bobby R. Inman ("Inman") has been a director of Massey since 1985. He was named Chairman of the Board in December 2010. Inman also serves as the Chairman of

5

the Executive, Governance and Nominating, and Public Policy Committees and is a member of the Compensation Committee.  Inman is a citizen of Texas.

19.    Defendant James B. Crawford ("Crawford") has been a director of Massey since February 7, 2005.  He is Chairman of the Safety and Environmental Committee and is a member of the Audit, Compensation and Executive Committees.  Crawford is a citizen of Virginia.

20.    Defendant Robert H. Foglesong ("Foglesong") has been a director of Massey since February 21, 2006.  He is Chairman of the Compensation Committee and is a member of the Audit, Executive, Safety and Environmental and Public Policy Committees.  Foglesong is a citizen of Mississippi.

21.    Defendant Richard M. Gabrys ("Gabrys") has been a director of Massey since May 22, 2007. He is Chairman of the Finance Committee and is a member of the Executive, Governance and Nominating and Public Policy Committees.  Gabrys is a citizen of Michigan.

22.    Defendant Robert B. Holland ("Holland") has been a director of Massey since August 16, 2010. He is a member of the Governance and Nominating Committee and the Safety and Environmental Committee.  Holland is a citizen of Texas.

23.    Defendant Dan R. Moore ("Moore") has been a director of Massey since January 22, 2002. He is Chairman of the Audit Committee and a member of the Compensation, Executive, Finance and Public Policy Committees.  Moore is a citizen of West Virginia.

24.    Defendant Stanley C. Suboleski ("Suboleski") has been a director of Massey since May 13, 2008. He is a member of the Finance, Public Policy and Safety and Environmental Committees.  Suboleski is a citizen of Virginia.

25.    Defendant Linda J. Welty ("Welty") has been a director of Massey since August 16, 2010. She is a member of the Audit Committee and the Governance and Nominating Committee.  Welty is a citizen of Georgia.

26.    The Defendants named above in ¶¶17-25 are sometimes collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

27.     Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, including a significant premium.   To diligently comply with these duties, neither the directors nor the officers may take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage, inhibit or deter alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

28.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Massey, are obligated under Delaware law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

29.     The Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith and independence owed to Plaintiff and other public shareholders of Massey.   The Individual Defendants are engaging in self-dealing and are obtaining for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the Class (as defined herein), in connection with the Proposed Acquisition.   As a result of the Individual Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their Massey common stock in the Proposed Acquisition.

30.     Defendants also owe the Company's stockholders a duty of truthfulness, which includes the disclosure of all material facts concerning the Proposed Acquisition and, particularly, the fairness of the price offered for the stockholders' equity interest.   Defendants are knowingly or recklessly breaching their fiduciary duties of candor and good faith by failing to disclose all material information concerning, among other things, the Company's true value, and/or aiding and abetting other Defendants' breaches.

31.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## BACKGROUND TO THE PROPOSED ACQUISITION

32.     Defendant Massey is the fourth largest coal producer in the United States, with extensive coal mining operations in West Virginia, Kentucky and Virginia.   By revenue, it is the largest – and lowest cost – coal producer in the Central Appalachian ("CAPP") region.   Since its

8

founding in 1920, Massey's location and substantial mining operations in the CAPP region has proved strategically advantageous over competitors, given the CAPP region's enormous coal reserves and proximity to the densely populated end-user urban areas along the eastern seaboard.

33.     Massey's stock has benefitted greatly over the last decade from two major developments in the coal industry: (1) the dramatic rise of coal consumption by developing countries such as Brazil, India and China; and (2) the increased interest in and funding for the development of clean coal technology as a domestic source of alternative energy.   Many industry analysts, such as Elliot Gue of The Energy Strategist investment service, have described coal as one of the leading investments for the coming decade:

> Coal is far and away the world's most-important source of electric power and has been for decades. Coal has been the fastest growing fossil fuel over the past five years. And thanks to widespread use in developing countries, coal demand is projected to grow at nearly twice the pace of oil for the next two decades. Coal accounts for 70 percent of electricity generated in India and closer to 80 percent of China's electricity. There are two good reasons for this: Coal is more abundant than oil or gas, and it's cheap.

Investing Daily, "King Coal," available at http://www.investingdaily.com/tes/16499/king-coal.html., May 2, 2007.

34.     Market analysts have also commented on Massey's ability to capitalize on the growing strength of coal: "Massey is the largest – and lowest cost -- coal producer in the Central Appalachian (CAPP) region, which is ideally located near the heavily-populated East Coast population hubs. The closer coal is to end-user demand, the lower the transportation costs, which makes coal pricing more competitive."  Based in part on this strategic positioning, Massey stock rose 480% from $19 per share on July 30, 2007 to an all-time high of $91.19 on June 23, 2008.

35.     Throughout much of 2008, Massey's stock traded substantially above the price being offered in the Proposed Acquisition.   But like many other publicly traded companies, Massey saw its stock price temporarily drop when the deep global economic recession took hold in late 2008 and 2009.   However, unlike many less strategically positioned companies, Massey's stock quickly rebounded more than 450% from its lows of two years ago, and reached a two-year

high of $58.04 only three weeks ago on January 12, 2011.  Given its strong position in the coal

industry, Massey is poised for further recovery.

## THE PROPOSED ACQUISITION

36.     In a January 29, 2011 press release entitled "Alpha Natural Resources and Massey

Energy Agree to $8.5 Billion Combination," Alpha and Massey announced, in pertinent part:

> Alpha Natural Resources, Inc. (NYSE: ANR) ("Alpha") and Massey Energy
> Company (NYSE: MEE) ("Massey") announced today that they signed a
> definitive agreement under which Alpha will acquire all outstanding shares of
> Massey common stock, subject to customary closing conditions including
> stockholder approval of both companies. Under the terms of the agreement,
> Massey stockholders will receive, at the closing, 1.025 shares of Alpha common
> stock and $10.00 in cash for each share of Massey common stock. Based on the
> closing share price of Alpha common stock as of January 28, 2011, the agreement
> placed a value of $69.33 per share of Massey common stock (implying $8.5
> billion enterprise value for Massey) and represents a 21% premium to Massey's
> current share price. Upon completion of the transaction, Alpha and Massey
> stockholders will own approximately 54% and 46% of the combined company,
> respectively.
>
> The merger will bring together Alpha's and Massey's highly complementary
> assets, which include more than 110 mines and combined coal reserves of
> approximately 5 billion tons, including one of the world's largest and highest-
> quality metallurgical coal reserve bases. Alpha and Massey believe the new entity
> will be well positioned to capitalize on strong global demand trends for coal
> including the metallurgical coal used in the steel manufacturing process. Further,
> the combination is expected to permit Alpha and Massey to benefit from
> geographical and asset diversification, including operations and reserves in
> Central and Northern Appalachia, the Illinois Basin and the Powder River Basin
> in Wyoming.
>
> The resulting company will have an attractive financial profile with expected pro
> forma 2010 revenues of approximately $6.9 billion and the highest free cash flow
> generation of any pureplay U.S. coal company, a responsible balance sheet, and
> significantly enhanced scale with a combined enterprise value of approximately
> $15 billion. Stockholders and customers of both companies will also benefit from
> synergies which are expected to exceed an annual run-rate of $150 million within
> the second year of operations, as well as anticipated cash flow accretion in the
> first full year of combined operations.
>
> "We're very pleased that Massey has chosen to join forces with Alpha and
> commit to this truly transformational deal," said Kevin Crutchfield, Alpha's chief
> executive officer. "Together we will be America's largest supplier of

metallurgical coal for the world's steel industry and a highly diversified supplier of thermal coal to electric utilities in the U.S. and overseas. The strategic and operational fit of our two companies is clear and compelling. Both companies' stockholders will gain an opportunity to participate in the upside potential of a global industry leader with a robust production portfolio, attractive growth profile and substantial reserve base. Together, we are committed to creating a stronger company that has the scale to capitalize on further growth opportunities, succeed in a changing regulatory landscape and maintain the absolute highest standards in safety and environmental excellence."

Baxter F. Phillips, Jr., Massey's chief executive officer and president, stated, "This transaction represents a tremendous opportunity for Massey to partner with our Central Appalachian neighbor, Alpha, to create a new industry leader. After a careful review of a wide range of strategic opportunities, our board unanimously determined that this is the right course for our company. The merger with Alpha offers Massey stockholders an immediate and substantial premium, as well as the opportunity to participate in the significant value creation opportunities our combination presents. We have always respected Alpha's passion for this business and we believe this is a natural and logical combination that has great upside for our members, communities, customers and other important constituents."

Mr. Crutchfield added, "As we demonstrated in the Foundation transaction, we have a proven history of successful integrations since our inception in 2002, and we've built a strong track record of creating value through thoughtful strategic growth. We're already prepared to launch a seamless integration process, which includes implementing our employee-driven Running Right philosophy of safety and environmental stewardship across the business. This is not just a combination of strong asset portfolios, but a transaction that will empower a combined group of almost 14,000 people and with a focus on continued investment in safety, the environment and our communities."

Alpha's chairman, Mike Quillen, commented, "We've always believed that the combination of Alpha and Massey makes for a great partnership, and we're thrilled about the opportunities this will create for the employees of both organizations. Their talents, skills and ambition will be the foundation of a dynamic industry leader."

The boards of directors of Alpha and Massey have each approved the terms of the definitive merger agreement and have recommended that their respective stockholders approve the transaction. The transaction is expected to close in mid-2011 and is subject to approval by each company's stockholders and customary regulatory approvals and closing conditions. Alpha has obtained $3.3 billion in committed financing from Morgan Stanley and Citi which, in addition to existing cash balances, will be sufficient to finance cash consideration to Massey stockholders and to refinance certain existing Alpha and Massey debt.

37.     Also on January 29, 2011, the Individual Defendants caused Massey to publish an "Agreement and Plan of Merger" with the SEC detailing the terms of the Proposed Acquisition.

## THE PROPOSED ACQUISITION IS GROSSLY UNFAIR TO SHAREHOLDERS

38.     The Individual Defendants, acting out of their own self-interest, negotiated and entered into an agreement with Alpha that is both procedurally and substantively grossly unfair to the Company's shareholders.   Procedurally, the terms of the Proposed Acquisition virtually ensure that the Proposed Acquisition will be consummated because of onerous deal protection devices such as a full "no shop" provision and a $251 million termination fee.   Moreover, the deal is substantively inadequate because it ignores Massey's past strong performance and its projected growth potential relative to Alpha's relatively flat stock performance.

### *The Proposed Acquisition is Procedurally Flawed*

39.     The Merger Agreement contains a full "no shop" clause which absolutely prohibits the Individual Defendants from soliciting higher competitive bids for the Company, in violation of the Individual Defendants' fiduciary duties to take best reasonable steps to secure the highest value for Massey.   Under Section 4.02 of the Merger Agreement, entitled "No Solicitation by the Company; Board of Directors of the Company Recommendation," the Company is absolutely prohibited from soliciting superior proposals or withdrawing its recommendation that the Company's shareholders approve the Proposed Acquisition:

(a) The Company shall not, nor shall it authorize or permit any of its Affiliates or any of its or their respective representatives to, (i) directly or indirectly solicit, initiate, induce, knowingly facilitate or knowingly encourage (including by way of providing non-public information) any Company Takeover Proposal or any inquiry, proposal or request for discussion that may reasonably be expected to lead to a Company Takeover Proposal, or (ii) directly or indirectly participate in any discussions or negotiations with any person regarding or cooperate in any way with any person (whether or not a person making a Company Takeover Proposal) with respect to any Company Takeover Proposal or any inquiry, proposal or request for discussion that may reasonably be expected to lead to a Company Takeover Proposal . . . .

(c) Except as set forth below, neither the Board of Directors of the Company nor any committee thereof shall (i) (A) withdraw (or qualify or modify in any manner adverse to Parent), the Company Board Recommendation . . . .

40.     In addition to the absolute "no shop" provision, the Merger Agreement also includes an onerous and prohibitive termination fee designed to ensure that the Merger is consummated. Section 5.06 of the Merger Agreement, entitled "Fees and Expenses," states that:

In the event that (i) this Agreement is terminated by the Company pursuant to Section 7.01(g)(ii) . . . then the Company shall pay to the Buyer Entities an aggregate amount equal to $251 million (the "Company Termination Fee") . . . .

41.     The "no shop" and "termination fee" provisions work in concert to prevent any competitive superior proposals from challenging Alpha's inadequate offer, and thus reflect the Individual Defendants' breaches of fiduciary duties by structuring and agreeing to a transaction ensuring that this grossly unfair transaction will be consummated. The "no shop" provision, by its terms, prevents the Company from soliciting any competitive proposals that could challenge Alpha's original offer, and thus create a bidding incentive for Alpha or a third company to raise the sale price. Importantly, this provision absolutely prohibits Massey from soliciting superior proposals, or changing its recommendation that its shareholders accept this proposal, even if the Company's stock price rises substantially above the Proposed Acquisition price in the future. Such restrictions deprive the Company's shareholders of the opportunity to secure the highest possible value for their equity interest in Massey.

42.     Moreover, the prohibitive early termination fee serves to chill other potential bidders from submitting unsolicited superior proposals to challenge the Proposed Acquisition. Knowing that Massey likely will not pay such an enormous termination fee, other potential bidders likely will not bother with the time, expense and effort involved in preparing and making a futile takeover bid.   Thus, Alpha is virtually assured to have no competition for Massey, allowing it to purchase the Company at a grossly unfair price.

43.     The Merger Agreement also contains an indemnification clause demonstrating the self-interested motivations of the Individual Defendants in agreeing to such a procedurally flawed and substantively inadequate takeover.   As part of the Proposed Acquisition, Alpha agrees to assume all of the liabilities of Massey's officers and directors – including the Individual Defendants – once the Proposed Acquisition is consummated.   This provision no doubt is extremely important to the Individual Defendants, given the numerous pending lawsuits in which they are named Defendants.   According to the Company's November 8, 2010 Form 10-Q, some or all of the Individual Defendants have been named in no fewer than eight shareholder derivative lawsuits and other class action suits arising from their alleged wrongdoing in connection with the tragic mine explosion at the Upper Big Branch Mine in West Virginia on April 5, 2010 that killed 31 people.   While defense of these lawsuits is certainly time consuming and costly for the Individual Defendants and subjects them to potential civil liability in the tens of millions of dollars, if the Individual Defendants are successful in pushing through the Proposed Acquisition all of this liability will be assumed by Alpha.   This fact unquestionably provides the Individual Defendants incentive to agree to the Merger, notwithstanding its procedural and substantive inadequacy.

44.     Moreover, the eight derivative lawsuits against the Individual Defendants will be extinguished entirely following the Merger, as Massey will become a wholly owned subsidiary of Alpha.

*The Proposed Acquisition is Substantively Inadequate*

45.     The Proposed Acquisition is also substantively inadequate, given Massey's strong stock performance historically and in the last six months, its strong position in the bullish coal industry, and Alpha's comparatively flat stock performance.

46.     Just before the global economic recession affected coal and other energy investments, Massey stock traded as high as $91.19, a full 32% over Alpha's $69.33 offer price. Though the stock significantly and temporarily dropped during the height of the recession, Massey's stock has rebounded over 450% to a high of $58.04 just three weeks ago.  This rebound includes a more than 300% stock climb in the last six months alone.  Market and industry analysts further expect that Massey is poised to continue its strong growth, given increasing demands for coal in the developing world and Massey's unique position as the largest and lowest cost coal producer in the strategically advantageous CAPP region.  Some analysts have projected that Massey's stock could easily climb over $70 in 2011.

47.     By contrast, Alpha's stock price has remained comparatively flat in the last six months while Massey's stock has more than tripled.  While Alpha's stock has traded at slightly higher prices during this period, its growth rate has paled in comparison to Massey's reflecting Alpha's comparatively weaker growth position.  Alpha's stock performance is obviously important in analyzing the substantive fairness of the Proposed Acquisition, because the majority of Alpha's $69.33 asking price includes a stock transfer in which Massey's stockholders will receive Alpha stock in exchange for their Massey stock.  Given Massey's demonstrated and projected growth compared to Alpha, this stock swap further indicates that the asking price is inadequate.

**THE INDIVIDUAL DEFENDANTS' HAVE BREACHED THEIR FIDUCIARY DUTIES**

48.     Under Delaware law, Defendants are obligated, as directors of the Company, to maximize value for the Company's shareholders in any change of control.

15

49.     Due to their positions with Massey, the Individual Defendants possess non-public information concerning the financial condition and prospects of Massey, and especially the true value and expected increased future value of Massey and its assets, which Defendants have not disclosed to the Company's public stockholders.  Moreover, despite their duty to maximize shareholder value, the Defendants have clear and material conflicts of interest and are acting to further their own interests, and the interests of Alpha, at the expense of the Company's public shareholders.

50.     The Proposed Acquisition is wrongful, unfair and harmful to the Company's public stockholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class.  Specifically, Defendants are attempting to deny Plaintiff and the Class their shareholder rights via the sale of Massey on terms that do not adequately value the Company.

51.     In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- withdraw their consent to the sale of Massey and allow the shares to trade freely – without impediments;

- act independently so that the interests of the Company's public stockholders will be protected;

- adequately ensure that no conflicts of interest exist between Defendants' own interests and their fiduciary obligation to maximize stockholder value and, to the extent such conflicts exist, ensure that all conflicts be resolved in the best interests of the Company's public stockholders;

- solicit competing bids to Alpha's offer to assure that the Company's shareholders are receiving the maximum value for their shares; and

- fully and fairly disclose all material information to shareholders regarding the Proposed Acquisition and the true value of the Company.

52.     Absent judicial intervention, Plaintiff and the Class will be irreparably injured.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action individually and as a class action on behalf of all holders of Massey stock who are being and will be harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

54.     This action is properly maintainable as a class action.

55.     The Class is so numerous that joinder of all members is impracticable.  According to the Company's SEC filings, there were more than 102 million shares of Massey common stock outstanding as of November 8, 2010.

56.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     Whether Defendants violated §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by filing a materially misleading Proxy;

(b)     whether the Individual Defendants, aided and abetted by Massey and Alpha, have breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(c)     whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(d)     whether the Individual Defendants, aided and abetted by Massey and Alpha, have breached their fiduciary duties to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(e)      whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Massey;

(f)      whether the Individual Defendants have breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(g)      whether the Individual Defendants have breached their fiduciary duties of candor to Plaintiff and the other members of the Class in connection with the Proposed Acquisition by soliciting shareholder votes in favor of the Proposed Acquisition based upon inadequate disclosures;

(h)      whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(i)      whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

57.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

58.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

59.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

60.      Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

61.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Class Claim for Violations of §14(a) of the Securities Exchange Act
### Against All Defendants

62.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

63.     Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

64.     In order to secure approval of the unfair Proposed Acquisition, Defendants filed a false and misleading Preliminary Proxy with the SEC on March 17, 2011.  The Proxy describes the terms of the Proposed Acquisition, the negotiation process, and the fairness opinions of Massey's financial advisor (Perella Weinberg Partners, LLC ("Perella")) and Alpha's financial advisor (Morgan Stanley & Co. ("Morgan Stanley")).  The Proxy misrepresented and/or omitted material information about the true value of the Company and the unfairness of the sales process. The Proxy contained numerous material omissions and misstatements, including those set forth below.

65.     The Proxy contains numerous false and misleading statements regarding the Proposed Acquisition, because it omits several categories of material information which

shareholders need in order to independently evaluate the substantive and procedural fairness of the Proposed Acquisition.

*Massey's "Strategic Alternatives Review Committee"*

66.     The Proxy omits significant material information regarding the composition, qualifications, and activities of the Massey committee charged with evaluating the Proposed Acquisition.   For example, the Proxy states that Massey's "Strategic Alternatives Review Committee" evaluated the Proposed Acquisition and ultimately recommended it to the full Board for approval, but fails to disclose the names of the members comprising this committee, the members' relevant backgrounds in considering transactions of this nature, and whether this is a standing committee or a special committee formed specifically to evaluate the Proposed Acquisition.

67.     Moreover, the Proxy states that while, UBS Securities, LLC ("UBS") serves as Massey's financial advisor, the Strategic Alternatives Review Committee selected Perella to serve as the financial advisor of the Proposed Acquisition.  However, the Proxy omits the reason for this decision, and the extent to which UBS analyzed the Proposed Acquisition and offered any opinions in connection with the Proposed Acquisition.

68.     The Proxy also contains the following statement:

On November 1, 2010, **the strategic alternatives review committee met and asked Perella Weinberg to solicit from Alpha, Company B and Company C written proposals for a potential business combination** that addressed all material terms, including price, certainty, timing, employee retention, financing and the strategic rationale for the combination. The strategic alternatives review committee asked Massey's management, Cravath and Perella Weinberg to provide them with regular updates on the process. Throughout the remainder of the process, the strategic alternatives review committee oversaw key elements of the process, including due diligence review and negotiation of material terms.

69.     This statement was materially false and misleading when made because it fails to disclose whether Perella was given authorization by the committee to independently select and contact other companies, or whether Perella was constrained to contacting only those potential suitors the Strategic Alternatives Review Committee selected for it.  This statement also fails to disclose whether Perella did in fact independently select and contact other potential suitors for a proposed transaction.

70.     The Proxy also states that the Strategic Alternatives Review Committee considered future projections of Massey earnings when determining whether to approve the Proposed Acquisition, and that Perella also considered a set of Massey's future projections. However, the Proxy fails to disclose if these future projections were the same, or if the Individual Defendants provided Perella with a different, more summary set of projections.

71.     Likewise, the Proxy fails to disclose whether the internal forecasts of Massey's future growth from 2011-2015 that Perella used in its discounted cash flow analysis were the same forecasts considered by the Strategic Alternatives Review Committee.

### *Negotiations by Massey's Board, Including the Individual Defendants*

72.     The Proxy also contains a number of false and misleading statements regarding the Massey Board's involvement in negotiations over the Proposed Acquisition.  For example, the Proxy contains the following statement:

> On August 23, 2010, on behalf of the Massey board of directors, Mr. Blankenship sent a letter to Mr. Crutchfield, informing him that the board of directors was unanimously of the view that the premium for Massey stockholders referenced in Alpha's August 11, 2010 non-binding proposal was not sufficient, but that further exploration of a potential business combination may be warranted. **Mr. Blankenship noted that the board of directors of Massey would consider "other factors" in addition to price when determining whether or not a potential business combination was in the best interests of Massey stockholders.** Mr. Blankenship included in his correspondence with Alpha a draft confidentiality and standstill agreement that was substantially identical to the

confidentiality and standstill agreement signed by Alpha and Massey in January 2007 (which had expired).

73.    This statement was materially false and misleading when made because it fails to disclose these "other factors" were in addition to price, and particularly failed to disclose whether these "other factors" included the nearly $7 million payment to Massey's Board included in the Proposed Acquisition, or the assumption of all legal liabilities by Alpha, including the numerous shareholder derivative suits currently pending against the Individual Defendants.

74.    The Proxy also states that former Massey CEO Don Blankenship opposed the Proposed Acquisition from as early as April 2010, when Alpha first expressed interest in a business combination, through his resignation from the Company in December 2010.  The Proxy also contains several statements indicating that Defendant Inman principally took over negotiation of the Proposed Acquisition from Blankenship in late September, and that Blankenship resigned his position and left Massey shortly thereafter.

75.    In particular, the Proxy contains the following statements:

On April 26, 2010, Mr. Quillen [of Alpha] met with Mr. Blankenship . . . *Mr. Blankenship informed Mr. Quillen that it was Mr. Blankenship's view that a potential business combination with Alpha was not in the best interests of Massey's stockholders at the time due to the depressed market value of Massey stock immediately following the UBB explosion*, but also indicated that he would convey Alpha's interest to Massey's board of directors. Shortly thereafter, Mr. Blankenship held a call with Admiral Bobby Inman, lead independent director of Massey, and Dan Moore, a director of Massey, to update them about the meeting he had with Mr. Quillen. *Mr. Blankenship stated his opinion that a potential business combination with Alpha was not in the best interests of Massey's stockholders at the time due to the depressed market value of Massey stock . . .*

On August 2, 2010, after roughly three months had passed, Mr. Crutchfield telephoned Mr. Blankenship to renew talks regarding a possible transaction and to arrange a meeting on August 5 to discuss a transaction in further detail.

22

On August 5, 2010, Mr. Crutchfield spoke with Mr. Blankenship to propose an all-stock transaction that would deliver a 20% premium to Massey stockholders at then-current prices. ***Mr. Blankenship reiterated his view that a transaction with Alpha was not in the best interests of Massey's stockholders at the time due to the depressed trading prices of Massey common stock following the UBB explosion.***

On September 17, 2010, on behalf of the Massey board of directors, Mr. Blankenship sent Mr. Crutchfield a letter agreeing to a meeting with Alpha on September 28, 2010 without a confidentiality and standstill agreement in place as a courtesy to Alpha and to further inform the deliberations of the Massey board of directors by understanding more about Alpha's proposal.

Subsequent to their September 28 meeting, Mr. Crutchfield and Adm. Inman spoke to each other by telephone on a number of occasions, with Adm. Inman providing Mr. Crutchfield with updates regarding the steps that the Massey board of directors and later the strategic alternatives review committee (described below) were taking to review the strategic alternatives available to Massey, including a possible business combination. During the course of these conversations, Mr. Crutchfield attempted to determine the likelihood that Massey's review of strategic alternatives would result in a willingness by Massey's board to negotiate a business combination with Alpha or whether Alpha should instead make an offer directly to Massey stockholders. ***Throughout the course of these conversations, Adm. Inman gave Mr. Crutchfield assurances that although Mr. Blankenship questioned whether the time was right to consider a business combination, the Massey board of directors was willing to consider a business combination with Alpha*** . . .

On December 3, 2010, Mr. Blankenship resigned, effective immediately, as Chairman of the board of directors of Massey and as Massey's Chief Executive Officer . . .

76.     These statements were materially false and misleading when made, because they fail to disclose why Defendant Inman overtook the principal negotiating role from Blankenship in late September, whether this change was forced by the Individual Defendants, and whether this change took place because of Blankenship's opposition to the Proposed Acquisition. These statements also fail to disclose materially relevant information regarding why Blankenship abruptly resigned in the middle of a negotiation of the sale of the Company that he steadfastly

opposed, whether he was forced out by Defendant Inman or the other Individual Defendants, and whether Blankenship resigned because he opposed the Proposed Acquisition.

77.     The Proxy also states that on September 28, shortly after Defendant Inman took over negotiation of the Proposed Acquisition for Massey, "Inman also indicated [to Alpha] that *there were several key operators at Massey who were very talented and that Alpha would be well served to recognize their talent and consider appropriate positions for them at Alpha if a business combination were consummated*." (emphasis added).  This statement was materially false and misleading when made because it failed to disclose what Defendant Inman meant by "key operators," who these "key operators" were, what "appropriate positions" Defendant Inman was referring to at Alpha, and whether this consideration of bringing over "key operators" from Massey was a factor in the Individual Defendants' ultimate decision to approve the Proposed Acquisition.

78.     The Proxy also contains the following statement:

> *In response to ongoing discussions with certain of its stockholders over the course of several months, Massey implemented several corporate governance reforms and agreed to hold a special stockholder meeting on October 6, 2010*. The corporate governance reforms adopted by the board of directors included (i) clarifying and increasing the responsibilities of the lead independent director, (ii) limiting the number of public company boards on which directors could serve, (iii) separating the safety, environmental and public policy committee into two committees, (iv) eliminating the tax excise gross-up from change in control agreements, (v) declassifying the board of directors, (vi) eliminating cumulative voting, (vii) eliminating the supermajority vote requirement for stockholders to approve bylaw amendments, (viii) removing the prohibition against stockholders requesting special meetings, (ix) eliminating the supermajority vote requirement for stockholder approval of business combinations with a greater than 5% stockholder and (x) increasing the number of authorized shares of common stock under Massey's certificate of incorporation from 150,000,000 to 300,000,000. Items (v) through (x) required a stockholder vote at the special meeting called for this purpose. On October 6, 2010, at a special meeting of stockholders, the stockholders of Massey approved all such matters that required a stockholder vote, with the exception of the proposal to eliminate cumulative voting.

79.     These corporate governance reforms effectively served to make it much easier for the Massey Board to approve of the Proposed Acquisition.  This Proxy statement was materially false and misleading when made because it failed to disclose which "certain . . . stockholders" Massey spoke to, whether these stockholders expressed concerns to Massey about general corporate governance or whether their concerns were limited to the Proposed Acquisition, why these particular stockholders wanted these particular corporate governance reforms easing the requirements on the Board to agree to the Proposed Acquisition, and whether these stockholders brought any further corporate governance reform ideas to Massey that were ultimately rejected. This statement was also materially false and misleading when made because it fails to disclose whether Blankenship supported or opposed these radical corporate governance changes designed to effectuate easier approval of the Proposed Acquisition.  This is a particularly troubling omission because Blankenship opposed the Proposed Acquisition and only nine days earlier had ceded principal control of the negotiations regarding the Proposed Acquisition.

80.     The Proxy also discusses a series of meetings called by Defendant Inman on October 12, 2010.  One of these executive meetings included all of Massey's independent directors.  The Proxy contains the following statement about this meeting: "The independent directors of Massey stated that if Massey chose to pursue a strategic transaction, management and Massey's advisors would need to employ a process *that maximized certainty of closing* . . ."

81.     This statement was materially false and misleading when made because it failed to disclose why the independent directors were concerned with employing a process that "maximized certainty of closing" rather than one that maximized value for Massey's public shareholders.

*Perella's Fairness Opinion*

82.    A number of significant omissions in the S-4 regarding Perella's fairness opinion also render the Proxy materially false and misleading.  For example, Perella conducts an analysis of Massey's value as a company as a going concern, or in other words on a stand-alone basis if no acquisition occurred.  However, while the Proxy discloses that Perella considered several different analyses and analysts' targets, it fails to disclose how many Perella considered or which ones it considered.

83.    Similarly, Perella conducted an illustrative future share price analysis of Massey as a going concern, and chose a certain multiples range for its analysis based on historical data from 2007-2010.  However, the Proxy fails to disclose how or why Perella chose the multiples range it chose, or what the actual historical ratios were that Perella considered.

84.    The Proxy also discloses that Perella conducted analyses of Massey's value as a company in a transaction such as the Proposed Acquisition.  For example, Perella conducted an analysis based on the enterprise value of EBITDA from the last twelve months before the Proposed Acquisition was announced, but fails to disclose any of the numbers used in this analysis.  Without these numbers it is impossible to tell whether the analysis was fair and reasonable.

85.    Similarly, Perella derived a multiples range to evaluate Massey's worth in connection with this analysis based on thirteen sets of historical financial data.  However, the Proxy fails to disclose any of this data, thus making it impossible to evaluate the analysis.

86.    The Proxy also discloses that Perella conducted a "premium paid statistics analysis" to determine Massey's value in a potential transaction.  In determining a fair premium to be paid in the Proposed Acquisition, Perella analyzed eighteen groups of allegedly similar

transactions, but the Proxy fails to disclose any information, statistics, or financial data from these groups of transactions.  Without this information it is impossible to determine how Perella conducted its analysis, how it arrived at the premium range it did, and whether the analysis was sound, fair, and reasonable.

87.     The Proxy also discloses that Perella did not conduct a comparable companies analysis, which is an absolutely standard analysis conducted in similar transactions.  However, the Proxy fails to disclose why Perella did not conduct such an analysis here, which is materially false and misleading particularly considering the fact that Morgan Stanley conducted such an analysis for Alpha.

88.     In addition, the Proxy fails to disclose how Perella derived a discount rate of return on equity for Massey of 14.5% when Morgan Stanley derived a discount rate of return on equity of only 11%.  Such a difference in two analyses of the same transaction is enormous, and without publication of the statistics and financial data used by Perella in its analyses it is impossible to tell how it derived such a high discount rate of return.

**COUNT II**

**Class Claim For Violation of §20(a) of the 1934 Act**
**Against Massey and the Individual Defendants**

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     The Individual Defendants acted as controlling persons of Massey within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of Massey, and their ownership of Massey stock, these Defendants had the power and authority to cause Massey to engage in the wrongful conduct complained of herein.  Massey controlled each

of the Defendants and all of its employees.  By reason of such conduct, these Defendants are liable pursuant to §20(a) of the 1934 Act.

91.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with ownership of Massey stock.

## COUNT III

### Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

92.     Plaintiff repeats and realleges each and every allegation set forth above.

93.     The Individual Defendants have violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of Massey and have acted to put their personal interests ahead of the interests of the Company's public shareholders.

94.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value inherent in and arising from Massey.

95.     The Individual Defendants have violated their fiduciary duties by causing Massey to enter into the Merger Agreement pursuant to an unfair process which has resulted in an unfair offer plagued by preclusive deal protection devices which inhibit superior proposals.

96.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Massey because, among other reasons:

(a)     they failed to take steps to maximize the value of Massey to its public shareholders and they took steps to avoid competitive bidding, to cap the price of the Company's stock and to give the Individual Defendants an unfair advantage, by, among other things, failing to adequately solicit other potential acquirers or alternative transactions;

28

(b)     they failed to properly value Massey and its various assets and operations;

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Acquisition; and

(d)     they have failed to disclose all material information to the Company's shareholders necessary for them to make a fully informed decision with respect to the Proposed Acquisition.

97.     Because the Individual Defendants dominate and control the business and corporate affairs of Massey, and are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Massey which makes it inherently unfair for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

98.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

99.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Acquisition which will exclude the Class from its fair share of the Company's valuable assets and operations, and/or benefit Defendants in the unfair manner complained of herein, all to the irreparable harm of Plaintiff and the Class.

100.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to Plaintiff and the members of the Class.

101.     As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of

the value of the Company's assets and operations.  Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and will not supply to the Company's minority stockholders sufficient information to enable them to cast informed votes regarding adoption of the Proposed Acquisition contract and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

102.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## COUNT IV

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty Against Defendants Massey and Alpha

103.    Plaintiff repeats and realleges each and every allegation set forth above.

104.    Defendants Massey and Alpha are sued herein as aiders and abettors of the breaches of fiduciary duties outlined above by the Individual Defendants as members of the Board of Massey.

105.    As detailed above, the Individual Defendants breached their fiduciary duties of good faith, loyalty, and due care to the Massey shareholders.

106.    Such breaches of fiduciary duties could not and would not have occurred but for the conduct of Defendants Massey and Alpha, which, therefore, aided and abetted such breaches via entering into the Merger Agreement.

107.    Defendants Massey and Alpha had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to the Massey shareholders.

108.   Defendants Massey and Alpha rendered substantial assistance to the Individual Defendants in the breach of their fiduciary duties owed to Massey shareholders.

109.   As a result of Massey's and Alpha's conduct of aiding and abetting the Individual Defendants' breaches of fiduciary duties, Plaintiff and the other members of the Class have been and will be injured in that they have been and will be prevented from obtaining a fair process or a fair price for their shares.

110.   As a result of the unlawful actions of Defendants Massey and Alpha, Plaintiff and the other members of the Class will be irreparably harmed in that they will be prevented from obtaining the real value of their equity ownership in the Company.   Unless the actions of Defendants Massey and Alpha are enjoined by the Court, they will continue to aid and abet the Individual Defendants' breaches of the fiduciary duties owed to Plaintiff and the members of the Class, and will aid and abet a process that inhibits the maximization of shareholder value and the disclosure of material information.

111.   Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants as follows:

A.   Declaring that this action is properly maintainable as a class action;

B.   Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of the Individual Defendants and that the Merger Agreement is therefore unlawful and unenforceable;

C.   Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company

adopts and implements a procedure or process to obtain the highest possible value for shareholders;

D.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of the Company's shareholders until the process for the sale or auction of the Company is completed and the best possible consideration is obtained for Massey;

E.      Rescinding, to the extent already implemented, the Proposed Acquisition agreement or any of the terms thereof, including the onerous and preclusive deal protection devices;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

Dated: April 4, 2011

/s/_____
SHIVA SHARIFAHMADIAN (VSB # 75411)

FINKELSTEIN THOMPSON LLP
DOUGLAS J. THOMPSON, JR.
RICHARD M. VOLIN
1050 30th Street, NW
Washington, D.C.  20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
Email: ssharif@finkelsteinthompson.com

*Counsel for Plaintiff*

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON
SHAWN E. FIELDS
501 West Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
8117 Preston Road, Suite 300
Dallas, TX 75225
Telephone: (214) 706-9314
Facsimile: (214) 706-9315


POWERS TAYLOR, LLP
PATRICK W. POWERS
Campbell Centre II
8150 N. Central Expressway, Suite 1575
Dallas, TX 75206
Telephone: (214) 239-8900
Facsimile: (214) 239-8901

*Of counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 4th day of April, 2011, the foregoing Plaintiff's First Amended Complaint, was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record, and was also served by e-Mail on the following counsel of record:

Kenneth J. Nachbar
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P. O. Box 1347
Wilmington, DE  19899-1347
knachbar@mnat.com
Tel:  (302) 351-9294

*Counsel to Defendant Baxter F. Phillips, Jr.*

Robert M. Rolfe
Hunton and Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  2319
rrolfe@hunton.com
Tel:  (804) 788-8466

*Counsel to Alpha Natural Resources, Inc.*

Timothly J. St. George
Troutman Sanders
1001 Haxall Point
Richmond, VA  23219
tim.stgeorge@troutmansanders.com
Tel:  (804) 697-1200

*Counsel to Defendants*
 *James B. Crawford, Robert H. Foglesong,*
*Richard M. Gabrys, Robert B. Holland, Bobby R.*
*Inman, Dan R. Moore, Stanley C. Suboleski,*
*Linda J. Welty and Massey Energy Company*

Frank J. Johnson
Shawn Fields
Johnson Bottini, LLP
501 W. Broadway, Suite 1720
San Diego, CA  92101
frankj@johnsonbottini.com
shawnf@johnsonbottini.com
Tel:  (619) 230-0063

*Counsel for Plaintiff Benjamin Mostaed*

By:     /s/_____
        Shiva Sharifahmadian (VSB # 75411)
        FINKELSTEIN THOMPSON LLP
        1050 30th Street NW
        Washington, D.C. 20007
        E-mail: ssharif@finkelsteinthompson.com
        Telephone: (202) 337-8000
        Facsimile: (202) 337-8090