

# APPENDIX A
## Allegations in Plaintiffs' Amended Complaint Addressed in the Definitive Proxy

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 66 | The Proxy . . . fails to disclose the names of the members comprising [the Strategic Alternatives Review Committee], the members' relevant backgrounds in considering transactions of this nature, and whether this is a standing committee or a special committee formed specifically to evaluate the Proposed Acquisition. | At a continuation of the Massey board meeting [on October 12, 2010], at which a quorum was present, the independent directors of Massey, who constituted a majority of the Massey board of directors and of those directors present, unanimously resolved to establish a strategic alternatives review committee consisting of Adm. Inman, Mr. Gabrys and Mr. Phillips to facilitate the board's review of Massey's strategic opportunities . . . . Adm. Inman was selected to serve on the strategic alternatives review committee because of his knowledge and experience gained from his service on the board of directors of Massey since 1985 and his considerable experience in finance and investments. Additionally, he was the lead independent director at the time of his appointment to the strategic alternatives review committee and had previously served on a committee reviewing strategic alternatives from the fall of 2006 to the spring of 2007. Mr. Gabrys was selected to serve on the strategic alternatives review committee because of his knowledge and experience gained from working in public accounting for 42 years, his valuable financial expertise, especially in the areas of public reporting and mergers and acquisitions, and his chairmanship of the finance committee. Mr. Phillips was selected to serve on the strategic alternatives review committee because of his experience in various positions in senior leadership of Massey, his tenure with Massey, his extensive knowledge of Massey and its operations, his previous service in investments and banking and his previous service on a committee reviewing strategic alternatives from the fall of 2006 to the spring of 2007. (Proxy at 71-72.) |

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 67 | Moreover, the Proxy states that while, UBS Securities, LLC ("UBS") serves as Massey's financial advisor, the Strategic Alternatives Review Committee selected Perella to serve as the financial advisor of the Proposed Acquisition. However, the Proxy **omits the reason for this decision**, and the extent to which UBS analyzed the Proposed Acquisition and offered any opinions in connection with the Proposed Acquisition. | Massey retained Perella Weinberg to act as financial advisor to its board of directors in connection with the merger. Massey selected Perella Weinberg because Perella Weinberg had not previously provided financial advisory services to Massey and based on Perella Weinberg's qualifications, expertise and reputation and its knowledge of the industries in which Massey conducts its business. Perella Weinberg, as part of its investment banking business, is continually engaged in performing financial analyses with respect to businesses and their securities in connection with mergers and acquisitions, leveraged buyouts and other transactions, as well as for corporate and other purposes. (Proxy at 101.) |

[[NYLIT:2573668v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 69 | [The Proxy] fails to disclose whether Perella was given authorization by the committee [at a meeting on November 1, 2010] to independently select and contact other companies, or whether Perella was constrained to contacting only those potential suitors the Strategic Alternatives Review Committee selected for it. [The Proxy] also fails to disclose whether Perella did in fact independently select and contact other potential suitors for a proposed transaction. | On November 1, 2010, the strategic alternatives review committee met and asked Perella Weinberg to solicit from Alpha, Company B and Company C written proposals for a potential business combination that addressed all material terms, including price, certainty, timing, employee retention, financing and the strategic rationale for the combination. In addition to soliciting written proposals from Alpha, Company B and Company C, Perella Weinberg was advised that the strategic alternatives review committee was open to receiving and considering expressions of interest from any and all parties that contacted Perella Weinberg regarding a potential business combination with Massey. In that regard, Perella Weinberg was instructed to report any such expressions of interest to the strategic alternatives review committee. The strategic alternatives review committee asked Massey's management, Cravath and Perella Weinberg to provide them with regular updates on the process. (Proxy at 73.)<br><br>On November 23, 2010, on behalf of the strategic alternatives review committee, Mr. Phillips spoke with representatives of Perella Weinberg by telephone to review next steps, which included reaching out to Company B and Company C, as well as Company D, which had recently contacted representatives of Perella Weinberg to express interest in a potential business combination with Massey. After contacting Company D, Perella Weinberg reported back to the strategic alternatives review committee that Company D was not interested in pursuing a transaction for the entire company. (Proxy at 75.) |

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 70 | The Proxy also states that the Strategic Alternatives Review Committee considered future projections of Massey's earnings when determining whether to approve the Proposed Acquisition, and that Perella also considered a set of Massey's future projections. However, the Proxy fails to disclose if these future projections were the same, or if the Individual Defendants provided Perella with a different, more summary set of projections. | Throughout the remainder of the process, the strategic alternatives review committee oversaw key elements of the process, including due diligence review and negotiation of material terms, and reviewed prospective financial information prepared by Massey's management that was also provided to Perella Weinberg. (Proxy at 73.) |
| 71 | Likewise, the Proxy fails to disclose whether the internal forecasts of Massey's future growth from 2011-2015 that Perella used in its discounted cash flow analysis were the same forecasts considered by the Strategic Alternatives Review Committee. | Throughout the remainder of the process, the strategic alternatives review committee oversaw key elements of the process, including due diligence review and negotiation of material terms, and reviewed prospective financial information prepared by Massey's management that was also provided to Perella Weinberg. (Proxy at 73.) |
| 73 | [The Proxy] fails to disclose [what the] "other factors" [referenced in the August 23, 2010 letter from Blankenship to Crutchfield] were in addition to price, and particularly failed to disclose whether these "other factors" included the nearly $7 million payment to Massey's Board included in the Proposed Acquisition, or the assumption of all legal liabilities by Alpha, including the numerous shareholder derivative suits currently pending against the Individual Defendants. | On August 27, 2010, on behalf of the Massey board of directors, Mr. Blankenship responded in a letter to Alpha by indicating that any potential business combination would be evaluated in accordance with the fiduciary duties of Massey's board of directors and his previous reference to "other factors" conveyed the principle that any proposed business combination would be evaluated as a total package. (Proxy at 69.) |

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 76 | [The Proxy is] materially false and misleading when made, because [it fails] to disclose why Defendant Inman overtook the principal negotiating role from Blankenship in late September, whether this change was forced by the Individual Defendants, and whether this change took place because of Blankenship's opposition to the Proposed Acquisition. [The Proxy also fails] to disclose materially relevant information regarding why Blankenship abruptly resigned in the middle of a negotiation of the sale of the Company that he steadfastly opposed, whether he was forced out by Defendant Inman or the other Individual Defendants, and whether Blankenship resigned because he opposed the Proposed Acquisition. | On October 12, 2010, the board of directors of Massey participated in a special telephonic meeting to discuss further the [September 13] proposal from Alpha . . . . Adm. Inman then called an an executive session of the independent directors that constituted a continuation of the board meeting . . . . [A] representative from Cravath discussed with the independent directors their fiduciary duties in connection with any potential business combination, potential board processes by which the board of directors of Massey could evaluate Massey's strategic alternatives and the independent directors' concerns regarding the risks relating to premature public disclosure. At a continuation of the Massey board meeting [on October 12, 2010], at which a quorum was present, the independent directors of Massey, who constituted a majority of the Massey board of directors and of those directors present, unanimously resolved to establish a strategic alternatives review committee consisting of Adm. Inman, Mr. Gabrys and Mr. Phillips to facilitate the board's review of Massey's strategic opportunities and with the power to (i) establish, oversee and direct a process for the development, evaluation and negotiation of potential strategic transactions, (ii) make recommendations to the board of directors of Massey in respect of strategic transactions and (iii) engage its own advisors. Adm. Inman was selected to serve on the strategic alternatives review committee because of his knowledge and experience gained from his service on the board of directors of Massey since 1985 and his considerable experience in finance and investments. Additionally, he was the lead independent director at the time of his appointment to the strategic alternatives review committee and had previously served on a committee reviewing strategic alternatives from the fall of 2006 to the spring of 2007. . . .<br><br>During the summer and fall of 2010, Mr. Blankenship had informal discussions with certain members of Massey's board of directors as he contemplated retiring, having served as Chairman of the Board and Chief Executive Officer of Massey for over a decade. During this same time frame, as Massey's board of directors took into consideration the environment in which Massey found itself and as it reflected upon Massey's future prospects as a stand alone company, the board of directors assessed whether Mr. Blankenship as Chairman of the Board and Chief Executive Officer provided the most viable option for Massey going forward. In connection with these discussions, Mr. Blankenship elected to submit his resignation to Massey's board of directors. (Proxy at 71-72, 76.) |

[[NYLIT:2573688v2-2416-4W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 77 | The Proxy also states that on September 28, shortly after Defendant Inman took over negotiation of the Proposed Acquisition for Massey, "Inman also indicated [to Alpha] that there were several key operators at Massey who were very talented and that Alpha would be well served to recognize their talent and consider appropriate positions for them at Alpha if a business combination were consummated." (emphasis added). This statement was materially false and misleading when made because it failed to disclose what Defendant Inman meant by "key operators," who these "key operators" were, what "appropriate positions" Defendant Inman was referring to at Alpha, and whether this consideration of bringing over "key operators" from Massey was a factor in the Individual Defendants' ultimate decision to approve the Proposed Acquisition. | Although it was not a factor in the Massey board of directors' evaluation of a potential business combination with Alpha, Adm. Inman also indicated that there were several key operators running Massey mines who were very talented and that Alpha would be well served to recognize their talent and consider appropriate positions for them at Alpha if a business combination were consummated. (Proxy at 70.) |

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 79 | [The Proxy] failed to disclose which "certain . . . stockholders" Massey spoke to [regarding corporate governance reforms adopted by the board and approved by Massey shareholders on October 6, 2010], whether these stockholders expressed concerns to Massey about general corporate governance or whether their concerns were limited to the Proposed Acquisition, why these particular stockholders wanted these particular corporate governance reforms easing the requirements on the Board to agree to the Proposed Acquisition, and whether these stockholders brought any further corporate governance reform ideas to Massey that were ultimately rejected. [The Proxy] was also materially false and misleading when made because it fails to disclose whether Blankenship supported or opposed these radical corporate governance changes designed to effectuate easier approval of the Proposed Acquisition. | Certain stockholders, many of which represented pension funds, had been in contact with Massey following the 2010 annual meeting of stockholders regarding proposals for corporate governance reforms supported by RiskMetrics. In response to the discussions with these stockholders, the Massey board of directors and the governance and nominating committee conducted a review of Massey's corporate governance with a willingness to consider further alignment of Massey's corporate governance policies with those of well known public companies and the recommendations of various corporate governance advisors. This review of Massey's corporate governance was conducted independently of the strategic review process. In response to this review of Massey's corporate governance, Massey implemented several corporate governance reforms and agreed to hold a special stockholder meeting on October 6, 2010. (Proxy at 71.) |
| 81 | [The Proxy] failed to disclose why the independent directors were concerned with employing a process that "maximized certainty of closing" rather than one that maximized value for Massey's public shareholders. | The independent directors of Massey stated that, if Massey chose to pursue a strategic transaction that would maximize stockholder value, management and Massey's advisors would need to employ a process that would also maximize the certainty of closing (including with respect to requisite antitrust and stockholder approvals and the availability of financing), while minimizing the risks to Massey's stockholders of premature public disclosure. (Proxy at 72.) |

7

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 82 | [W]hile the Proxy discloses that Perella considered several different analyses and analysts' targets [in its analysis of Massey's value on a standalone basis], it fails to disclose how many Perella considered or which ones it considered. | Perella Weinberg reviewed and analyzed the price targets for Alpha and Massey common stock published by equity research analysts (Barclays, BMO, Brean Murray Carret & Co., Citi, Credit Suisse, Dahlman Rose & Co., Deutsche Bank, FBR Capital Markets, Goldman Sachs, Jeffries & Company, Macquarie Bank, Raymond James and UBS, with respect to Alpha, and Barclays, BMO, Brean Murray Carret & Co., Citi, Credit Suisse, Dahlman Rose & Co., Deutsche Bank, FBR Capital Markets, Goldman Sachs, Jeffries & Company, JP Morgan, Macquarie Bank and UBS, with respect to Massey) during the period from January 1, 2011 through January 26, 2011. (Proxy at 104.) |
| 83 | [T]he Proxy fails to disclose how or why Perella chose the multiples range it chose [for its illustrative future share price analysis], or what the actual historical ratios were that Perella considered. | Perella Weinberg determined the average value of the price per share of Massey common stock on January 26, 2011 as a multiple of NTM EBITDA since 2007 to 2010. Based on the analysis and historical review of this multiple for Massey, Perella Weinberg derived a range of illustrative future share prices for shares of Massey common stock by applying a multiple range of 5.5x to 7.0x to estimated EBITDA for calendar years 2011E, 2012E, 2013E and 2014E. The multiple range of 5.5x to 7.0x is in line with the middle of the range at which Massey had traded from 2007 to 2010. (Proxy at 105.) |
| 84 | [The Proxy] fails to disclose any of the numbers used in [the] analysis [of the value of Massey based on the ratio of enterprise value to EBITDA from the last twelve months]. | Based on the multiples calculated by Perella Weinberg and Perella Weinberg's analyses of the various selected transactions and on judgments made by Perella Weinberg, Perella Weinberg derived a range of implied equity value per share of Massey common stock of approximately $39 to $57 by applying multiples ranging from 5.0x to 7.0x to Massey's estimated 2011E EBITDA of $968 million. (Proxy at 108.) |

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 85 | Similarly, Perella derived a multiples range to evaluate Massey's worth in connection with this analysis based on thirteen sets of historical financial data. However, the Proxy fails to disclose any of this data, thus making it impossible to evaluate the analysis. | The transactions analyzed and the EV as a multiple of LTM EBITDA for each are set forth below:<br><br>| Target | Acquirer | EV/LTM EBITDA | Announcement Date |<br>|---|---|---|---|<br>| Western Coal Corp. | Walter Energy, Inc. | 16.4x | 11/18/2010 |<br>| Cumberland Resources Corp. | Massey Energy Co. | 8.3x | 3/16/2010 |<br>| Foundation Coal Holdings, Inc. | Alpha Natural Resources, Inc. | 7.6x | 5/12/2009 |<br>| Jacobs Ranch Mine | Arch Coal, Inc. | 7.2x | 3/9/2009 |<br>| Magnum Coal Co. | Patrial Coal Corp. | 13.9x | 4/2/2009 |<br>| AMWEST Corporation | Consol Energy, Inc. | 5.0x | 6/18/2007 |<br>| PinnOak Resources, LLC | Cliffs Natural Resources, Inc. | 6.1x | 6/14/2007 |<br>| Canyon Fuel Company, LLC | Arch Coal, Inc. | 4.5x | 7/15/2004 |<br>| RAG AG U.S. Coal Mining Operations | Consortium of Buyers | 5.4x | 5/25/2004 |<br>| Vulcan Coal Holdings LLC | Arch Coal, Inc. | 4.5x | 7/15/2004 |<br>| Cyprus Amax Coal Company | RAG AG | 7.2x | 5/12/1999 |<br>| Kerr-McGee Corporation Coal Mining Operations | Consortium of Buyers | 8.7x | 6/8/1998 |<br>| Atlantic Richfield Company's U.S. Coal Operations | Arch Coal, Inc. | 6.6x | 3/23/1998 |<br>| The Coastal Coal Corp. Western Coal Operations | Atlantic Richfield Company | 6.6x | 10/23/1996 |<br><br>(Proxy at 108.) |

9

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 86 | The Proxy also discloses that Perella conducted a "premium paid statistics analysis" to determine Massey's value in a potential transaction. In determining a fair premium to be paid in the Proposed Acquisition, Perella analyzed eighteen groups of allegedly similar transactions, but the Proxy fails to disclose any information, statistics, or financial data from these groups of transactions. Without this information it is impossible to determine how Perella conducted its analysis, how it arrived at the premium range it did, and whether the analysis was sound, fair, and reasonable. | Perella Weinberg analyzed the premiums paid in acquisitions of United States companies with transaction values ranging between $1 billion and $10 billion. The acquisitions were grouped according to various consideration mixes in the form of (a) all stock, (b) a combination of stock and cash and (c) all cash, and analyzed over various time periods of 12 months, 3 years and 5 years prior to January 9, 2011. For each of the transactions, based on publicly available information, Perella Weinberg calculated the premiums of the offer price in the transaction to the target company's closing stock price one day and one month prior to the announcement of the transaction. Perella Weinberg observed that the medians of premiums of the target company closing stock price one day prior to transaction announcement ranged from 22.2% to 30.8% over the different consideration mixes and time periods. The medians of premiums to target company stock price one month prior to transaction announcement ranged from 18.6% to 38.2% over the different consideration mixes and time periods. Perella Weinberg observed that, as discussed above under "—Historical Stock Trading and Transaction Premium Analysis," on page 104, the implied premium represented by the merger consideration to be received by the holders of shares of Massey common stock in the merger (a) relative to $55.26, the closing market price per share of Massey common stock on January 26, 2011, was 25.5% and (b) relative to $35.56, the closing market price per share of Massey common stock on the Pre-Rumor Price Date, was 95.0%. Based on the range of premiums that were paid for the transactions that were analyzed, and taking into consideration that the price of the common stock of as of January 26, 2011 had been affected with an acquisition premium, Perella Weinberg selected a representative range of implied premiums of 0-20%, applied this range of premiums to the price of common stock of $55.26 as of January 26, 2011 and implied a range for common stock of approximately $55.26 to $66.31 per share. (Proxy at 108-09.) |

10

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 87 | [T]he Proxy fails to disclose why Perella did not conduct [a comparable companies] analysis here, which is materially false and misleading particularly considering the fact that Morgan Stanley conducted such an analysis for Alpha. | **Comparable Company Analysis**<br><br>Perella Weinberg performed a comparable company analysis, which is designed to provide an implied value of a company by comparing it to similar companies. Perella Weinberg compared certain financial information of Alpha and Massey with publicly-available information for peer group companies that operate in and are exposed to similar lines of business as Alpha and Massey, namely Diversified United States-based and Central Appalachian-based coal producers. The peer group consisted of:<br><br>• Alpha Natural Resources, Inc.;<br>• Arch Coal, Inc.;<br>• Cloud Peak Energy Inc.;<br>• CONSOL Energy Inc.;<br>• International Coal Group, Inc.;<br>• James River Coal Company;<br>• Massey Energy Company;<br>• Patriot Coal Corporation;<br>• Peabody Energy Corporation; and<br>• Walter Energy, Inc.<br><br>This peer group was selected based upon the experience and judgment of Perella Weinberg and does not include all publicly traded coal producers. Peers were selected based upon criteria including but not limited to: regions of operation, types of coal production, company size and strategic positioning. For this analysis, Perella Weinberg analyzed the following statistics for each of these companies, as of January 26, 2011 and based on estimates for the peer group companies provided by I/B/E/S and public filings:<br><br>• EV as a multiple of estimated EBITDA for calendar year 2011;<br>• EV as a multiple of estimated EBITDA for calendar year 2012;<br>• the ratio of price per share to EPS for calendar year 2011; and<br>• the ratio of price per share to EPS for calendar year 2012.<br><br>Based on the analysis of the relevant metrics for each of the comparable companies and on the experience and judgment of Perella Weinberg, Perella Weinberg selected a representative range of financial multiples of the comparable companies and applied this range of multiples to the Massey Public Forecast and Alpha Public Forecast. Based on the multiples selected by Perella Weinberg, Perella Weinberg derived ranges of implied value per share of Massey common stock as of January 26, 2011 as follows: |

11

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| | | Financial Multiple   Representative Range   Implied Value Per Share of Massey Common Stock ($)<br>EV/2011E EBITDA   5.5x – 7.0x   $43 – $57<br>EV/2012E EBITDA   4.75x – 5.75x   $47 – $59<br>Price/2011E EPS   11.0x – 14.0x   $42 – $54<br>Price/2012E EPS   8.0x – 10.0x   $44 – $55<br><br>Based on the multiples selected by Perella Weinberg, Perella Weinberg derived ranges of implied value per share of Alpha common stock as of January 26, 2011 as follows:<br><br>Financial Multiple   Representative Range   Implied Value Per Share of Alpha Common Stock ($)<br>EV/2011E EBITDA   5.5x – 7.0x   $58 – $72<br>EV/2012E EBITDA   4.75x – 5.75x   $60 – $71<br>Price/2011E EPS   11.0x – 14.0x   $52 – $66<br>Price/2012E EPS   8.0x – 10.0x   $49 – $61<br><br>No company in the comparable company analysis is identical to Massey or Alpha. In evaluating the peer group, Perella Weinberg made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Massey and Alpha, such as the impact of competition on the business of Massey, Alpha or the industry generally, industry growth and the absence of any material adverse change in the financial condition and prospects of Massey, Alpha or the industry or in the financial markets in general. Mathematical analysis, such as determining the average or median, is not in itself a meaningful method of using peer group data. (Proxy at 106-07.) |

| Am. Compl. Para. | Alleged Deficiency | Definitive Proxy, Dated April 29, 2011 |
|---|---|---|
| 88 | [T]he Proxy fails to disclose how Perella derived a discount rate of return on equity for Massey of 14.5% when Morgan Stanley derived a discount rate of return on equity of only 11%. Such a difference in two analyses of the same transaction is enormous, and without publication of the statistics and financial data used by Perella in its analyses it is impossible to tell how it derived such a high discount rate of return. | Perella Weinberg derived its discount rate of return on equity based on the capital asset pricing model. Perella Weinberg used a risk-free rate based on the 10-year Treasury, a beta based on the median beta of the comparable company set, and a market risk premium provided by the 2010 Ibbotson SBBI Yearbook. (Proxy at 105.) |

[[NYLIT:2573688v2:4164W:05/26/11--11:30 a]]