IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BENJAMIN MOSTAED,
*on behalf of himself and all others similarly situated*

Civil Action No. 3:11-cv-00079-JAG

and

WILLIAM D. PERKINS,
*on behalf of himself and all others similarly situated*

Civil Action No. 3:11-cv-00082-JAG

Plaintiffs,

v.

JAMES B. CRAWFORD,
ROBERT H. FOGELSONG,
RICHARD M. GABRYS,
ROBERT B. HOLLAND,
BOBBY R. INMAN,
DAN R. MOORE,
BAXTER F. PHILLIPS, JR.,
STANLEY C. SUBOLESKI,
LINDA J. WELTY,
MASSEY ENERGY COMPANY,
ALPHA NATURAL RESOURCES, INC.,

Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the motion for attorneys' fees of the plaintiffs, Benjamin Mostaed and William D. Perkins.  In the brief life of this case, the plaintiffs filed a complaint and an amended complaint, and then announced that they would drop the case.  For these efforts, they demand $900,000 in fees, and an incentive award of $2,000 to each plaintiff.  Their motion is denied.

The case arises from the purchase of Massey Energy Company ("Massey") by Alpha Natural Resources, Inc. ("Alpha"). The plaintiffs opposed the acquisition, and sued, first and foremost, in order to stop the deal. Ignoring the fact that they failed to stop the acquisition, they now claim success and seek attorneys' fees as a result. They do this by recasting their suit as purely a request for information in the proxy statement. Under Delaware law, which controls due to the plaintiffs' common law fiduciary claims, a court may, in its discretion, award attorneys' fees under the "corporate benefit doctrine." This doctrine rewards plaintiffs whose efforts result in the conferral of a corporate benefit to other shareholders generally, even if the suit does not continue to fruition. In this case, since additional information was inserted into the proxy statement, the plaintiffs claim success.

They are not entitled to a recovery of fees. The plaintiffs' request for fees is fundamentally flawed: it is excessive, it lacks any independent evidence of its reasonableness, it lumps together requests for non-compensable items with those that are arguably compensable, and its allocation of hours worked relative to tasks completed is clearly incorrect. Alternatively, the corporate benefit doctrine does not help the plaintiffs because all the additional disclosures either were redundant of information already in the proxy statement, resulted from independent forces, or fail to meet the "materiality" standard necessary for an award. In its discretion, the Court denies the motion entirely.

## I.    Statement of Facts

In fall 2010, defendant Massey, then a publicly-traded company, began looking into the possibility of acquisition by a third party. It appointed a Strategic Alternatives Review Committee of its Board of Directors to analyze options, and the Committee in turn hired Perella Weinberg Partners LP ("Perella Weinberg") as its financial advisors. Massey publicly disclosed

2

these measures and conducted an auction for interested bidders in late 2010 and early 2011. Multiple parties submitted proposals, including the winning bidder, defendant Alpha Natural Resources, Inc. As a result of this competitive process, Alpha raised its offer several times. At the start of the auction, Alpha's bid was $37 per share of Massey stock. By the time the deal closed on January 28, 2011, Alpha had agreed to total consideration of $69.33 per share—an increase of more than 87%.

On February 2, 2011, plaintiff Benjamin Mostaed filed his original complaint, alleging that the attempted sale of Massey to Alpha resulted from a flawed and unfair process. According to the plaintiff, the deal reflected a lack of profit maximization for the shareholders, in part because the directors agreed to a "no solicitation" clause and a termination fee in the event that a more lucrative buyout offer came along. He claimed that, as a result of misconduct by the directors and the company, the offer price was substantively unfair. In addition, Mostaed complained that the merger damaged shareholders both by extinguishing eight or more derivative suits against the individual defendants and by bestowing liability for at least three other lawsuits on the acquiring company. These defects, according to the plaintiff, constituted breaches of the fiduciary duties of loyalty, due care, candor, independence, good faith, and fair dealing on the part of the Massey Directors (the individual defendants) and the Massey Energy Company. In short, Mostaed claimed that the defendants were placing their own interests ahead of the shareholders' interests.

On February 4, 2011, plaintiff William D. Perkins filed an almost identical shareholder class action complaint against the very same defendants. The Court consolidated the two actions.

3

On March 17, 2011, the defendants submitted a preliminary proxy statement to the Securities and Exchange Commission (SEC), as required by federal law. Among other things, the statement discussed the background of the proposed merger, summarized the advice from Perella Weinberg, and provided a full copy of Perella Weinberg's "fairness opinion." A revised preliminary proxy was then submitted to the SEC on April 12, 2011. This draft responded to the SEC's comments on the original proxy, and it also included Perella Weinberg's "comparable companies analysis" in the body of the statement. On April 21, 2011, the defendants filed yet another draft proxy in response to SEC feedback. Finally, on April 28, 2011, the SEC declared the proxy "effective," which made it lawful for the defendants to solicit proxies with the statement. The following day, the defendants distributed their definitive proxy statement to Massey shareholders for the first time.

Meanwhile, on April 4, 2011, Mostaed filed an amended complaint containing all the allegations in the first complaint and additionally claiming that the defendants had filed with the SEC a materially false and misleading preliminary proxy, designed to induce shareholder action and resulting in substantial harm to the plaintiffs. The plaintiffs argued that the "dissemination" of this false and misleading proxy violated both the Securities and Exchange Act of 1934 and Delaware law regarding the fiduciary duties of directors with respect to shareholders. In particular, the plaintiffs contended that the proxy was misleading "because it omits several categories of material information which shareholders need in order to independently evaluate the substantive and procedural fairness of the Proposed Acquisition." (Am. Comp. ¶ 65.) It went on to catalog thirteen categories of alleged misinformation.

The original and amended complaints requested the same relief. The plaintiffs asked that the Court enter an order:

A. Declaring that this action is properly maintainable as a class action;

B. Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of the Individual Defendants and that the Merger Agreement is therefore unlawful and unenforceable;

C. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for shareholders;

D. Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of the Company's shareholders until the process for the sale or auction of the Company is completed and the best possible consideration is obtained for Massey;

E. Rescinding, to the extent already implemented, the Proposed Acquisition agreement or any of the terms thereof, including the onerous and preclusive deal protection devices;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, and;

G. Granting such other and further equitable relief as this Court may deem just and proper.

(Am. Comp. 31–32.)  In other words, the plaintiffs wanted the Court to stop the deal from going through until Massey shareholders got the "highest possible" price for their stock. The object of the lawsuit was not more information, but more money. The plaintiffs secured none of the relief they listed in the complaints.

Interestingly, although the plaintiffs claimed the proxy misled voting shareholders and thereby threatened them with serious harm, the plaintiffs did not take the logical next step of seeking a preliminary injunction after the filing of either complaint. Instead, the plaintiffs maintain that Mostaed "obtained an informal discovery agreement" "through the skillful negotiation of counsel," which allowed plaintiffs' counsel to review hundreds of thousands of documents "around the clock and on an expedited basis" in preparation of the shareholder vote. (Pl's Mem. Supp. Motion for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards 8–9.)  The defendants point out, however, that none of these documents were sent to

Mostaed's counsel until *after* the filing of the amended complaint, which is why that pleading refers to no document other than the merger agreement and the March 17 preliminary proxy.

All the while, separate litigation between Massey shareholders and directors was going on in the Delaware Court of Chancery, a court that frequently deals with disputes of this very kind. *In re Massey Energy, Co.*, 2011 WL 2176479 (Del. Ch. May 31, 2011) (Strine, V.C.). The Delaware litigation began in April 2010 as a derivative action alleging that Massey directors and officers had breached their fiduciary duties by failing to adequately oversee the company's compliance with safety regulations, resulting in a tragic accident that killed 29 miners.

After the proposed merger was announced on January 31, 2011, the Delaware plaintiffs filed a second amended complaint, seeking to enjoin the merger. The defendants say that the Delaware second amended complaint represents the first pleading anywhere that had the purpose of blocking the merger. The new complaint tacked on a set of claims nearly identical to those Mostaed would bring a few days later, including that the directors were generally placing their interests ahead of shareholders' interests, that the directors had the ulterior motive of eliminating existing derivative suits, and that they had structured the transaction to prevent superior proposals from being made. At least two additional class complaints based on breach of fiduciary duties would be consolidated with the Delaware litigation. For these reasons, the defendants in the present matter moved to stay the proceedings pending the resolution of the Delaware litigation. (*See* Defs.' Mem. Supp. Motion to Stay.)

The plaintiffs in this action, however, challenged the idea that the Delaware litigation and the present matter ("Virginia litigation") were "parallel" in character. "The only similarities between them," they contended, "stem from the Delaware plaintiffs' hasty attempt to add 'tag-along' direct claims challenging the Proposed Merger to their otherwise entirely derivative

action." (Pl's Mem. Opp. Motion to Stay 4.)   The plaintiffs claim that the Delaware litigation was "primarily derivative in nature" and sought to "benefit Massey," whereas the Virginia litigation "names Massey as a defendant and seeks to stop its aiding and abetting its directors' and officers' breaches of fiduciary duties arising from the Proposed Merger." (*Id.* at 9–10.)   This attempt at distinction is a meaningless shell game: both suits tried to stop the acquisition.

Following the early April document production, the plaintiffs next sought discovery on May 16, 2011—six weeks after filing the amended complaint and six days after the Court had scheduled an initial pretrial conference for June 2, 2011.   Two depositions were noticed for May 31 and June 1, 2011, respectively, and, in response, the defendants filed a motion for a protective order on May 26, 2012.   The Court stayed all further discovery until the June 2 pretrial conference.

On June 1, 2011, the merger was approved, with over 99% of Massey shareholders voting in favor.   On June 23, 2011, Mostaed informed the Court of his decision to dismiss the case voluntarily, but only after seeking compensation for attorneys' fees and expenses incurred in the litigation.[1]   On July 13, 2011, the present motion was filed.

## II.      Standard of Review

The American Rule holds that litigants generally bear the costs of their own attorneys' fees and expenses.   But under Delaware's "corporate benefit doctrine," a court "may order the payment of counsel fees and related expenses to a plaintiff whose efforts result in . . . the conferring of a corporate benefit." *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989) (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966).   While these benefits "need not be pecuniary" in character, they must be "substantial," not merely *de minimis*, to merit

---

[1] Oddly, after plaintiffs' counsel advised the Court they would dismiss the case, which is ostensibly a class action, they moved to be appointed lead counsel.   That motion shall be denied.

an award of attorneys' fees. *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010).

Since Mostaed's motion for attorneys' fees derives from a nondisclosure claim, the Court must look to the Delaware common law of fiduciary duties to determine the merit of the underlying shareholder action.  Directors of Delaware corporations are fiduciaries who owe duties of care, good faith, and loyalty to the company and its stockholders. *See Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000). These duties require that directors "disclose fully and fairly all material information within the board's control" when seeking stockholder action. *Id.* The Supreme Court of Delaware has explained the materiality standard as follows:

> Omitted facts are material if there is a substantial likelihood that a reasonable stockholder would consider [them] important in deciding how to vote.  Stated another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the total mix of information made available.

*Id.* In the present case, the relevant stockholder action being sought was the vote of approval for the proposed merger.

In short, the Court has the discretion to award attorneys' fees to the plaintiffs if (1) their litigation resulted in a substantial corporate benefit in the form of additional material disclosures made by the Massey Board of Directors and (2) these disclosures, as viewed by a reasonable stockholder, were substantially likely to significantly alter the total mix of information when deciding whether to approve or vote against the merger proposal.

### III.    Discussion

#### A.  The Fee Request Is Unreasonable, Inequitable, and Insufficiently Documented

Even before considering the corporate benefit doctrine, this Court concludes that fees are not appropriate under the circumstances and will accordingly deny the plaintiff's motion. Several reasons lead to the Court's conclusion.

8

### 1. The Request Is Unconscionable

First, the amount of money requested is simply shocking. This case had a very short life. The plaintiffs filed suit, filed an amended complaint, and reviewed documents voluntarily provided by the defendants. At an early stage, the plaintiffs announced that they would dismiss the case. In essence, they came to the battlefield, pitched their tents, and then retreated to safety. For these efforts, they seek nearly one million dollars in fees.

While the Court encourages creative advocacy, the plaintiffs' request for fees is outlandish, excessive, and inequitable. Notably, the plaintiffs did not secure *any* of the relief they requested in their complaint: all the relief requested had the goal of stopping the acquisition unless they got more money for their shares. The only time the Court decided anything in the plaintiffs' favor was when it granted them leave to file an amended complaint, which is no victory of any kind.

The Court may deny a request, such as this one, that shocks the conscience. *American Canoe Ass'n, Inc. v. United States E.P.A.*, 138 F. Supp. 2d 722, 743 (E.D. Va. 2001). The Court will not sanction this type of fee demand, and it shall be denied for that reason alone.

### 2. The Fee Request Is Not Supported by Evidence of its Reasonableness

To grant a motion for attorneys' fees, the Court must determine the reasonable hourly rate and a reasonable amount of time for counsel to have worked on the case. A plaintiff must establish that the attorneys' hourly rates coincide with the prevailing market rates of local attorneys performing similar work and with similar skills. *Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 245 (4th Cir. 2009). By the same token, the plaintiff bears "the burden of providing the court with evidence from which the court can assess the reasonableness of the time requests." *Project Vote/Voting for America, Inc. v. Long*, 2012 WL 3638546, at *8 (E.D. Va. Aug. 22,

2012).  To carry the burden, a plaintiff may not simply rely on his or her own attorneys' report and analysis of their work.  "*In addition to the attorney's own affidavits*, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." *Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 244 (4th Cir. 2009) (emphasis added); *Project Vote/Voting for America*, at *4 (relying on an expert's affidavit on reasonableness of amount of time invested in the case).[2]

In this case, the plaintiffs have produced only the affidavits of their own lawyers.  While the lawyers characterize their own work as skillful, their rates as reasonable, and the time spent as necessary, such evidence does not carry the day.  The plaintiffs must offer unbiased, external evidence of the fees' reasonableness.  The plaintiffs have not met their burden.

### 3.  Plaintiffs' Counsel Has Not Adequately Documented Time Spent on this Case

It goes without saying that to recover fees a lawyer must prove the amount of time spent in the case.  Typically, some sort of contemporaneous time records will suffice.  Here, however, the plaintiffs have provided little to assist the Court in determining the number of hours spent on each task in the case.  "[T]he applicant must make every effort to submit time records which specifically allocate the time spent on each claim." *Fair Housing Council v. Landow*, 999 F.2d 92, 97 (4th Cir. 1993).  Adequate, comprehensible time records are essential to evaluating a request for attorneys' fees.

Unfortunately, the time records proffered by plaintiffs' attorneys are anything but comprehensible.  Finkelstein and Thompson, one of the firms representing the plaintiffs, has submitted a declaration with 17 pages of time entries attached, but not in chronological order.

---

[2] To the extent the plaintiffs seek to recover market rates that attorneys charge in a different part of the country, they must also produce evidence that local counsel could not handle the case. *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175, 179 (4th Cir. 1994).  The plaintiffs have offered no such evidence.

This makes it impossible to reconstruct the firm's work in order to determine a reasonable number of hours spent.

Johnson & Weaver, another firm representing the plaintiffs, has submitted a declaration with time lumped together in broad categories. For instance, one "activity" undertaken by the firm was "Research and drafting" a motion to consolidate Mostaed and Perkins' claims, a motion to expedite proceedings, an opposition to a motion to stay, and two discovery requests. For these matters, Johnson & Weaver's "approximate time expended" is 130.9 hours. The firm does not elucidate why such simple tasks took the equivalent of over three weeks' work. Nor does the firm state which attorneys worked on the various matters and how their time was allocated among the tasks. The Court simply cannot determine whether those hours worked are reasonable. Johnson & Weaver lumps the rest of its time under six other broad categories of labor. Again, the submission makes it impossible to determine whether the time was reasonably spent.

In sum, the plaintiffs' lawyers effectively ask the Court to bless their claimed time without any scrutiny. The Court cannot do so.

### 4. The Time Records Misstate the Facts

To the extent one can determine what happened and when it happened, the time records are simply inaccurate and inconsistent with the motion for fees.

For instance, the fee application says that the plaintiffs do not seek recovery for attorneys' time spent on the fee application. (Johnson Declaration ¶ 59.) Yet, one of the lumped time categories attempts to recover for "preparation of motion for award of attorneys' fees and incentive awards." (*Id.* ¶ 60.) The lawyers attempt, furthermore, to collect fees for things that

simply did not happen. As an example, they seek payment for "confirmatory" discovery and an approval hearing. (Thompson Declaration ¶ 5.) Neither of these events occurred in the case.

Finally, they submit farfetched requests for payment. A prime example of this tactic is listing 52.3 hours to attend an initial pretrial conference in Richmond and a hearing in Delaware for a preliminary injunction to stop the acquisition. The pretrial conference took—at most—an hour; the Delaware hearing took four hours. (Johnson Declaration ¶ 60; Lowenthal Declaration ¶ 2.) Yet counsel inflates these efforts into a 52.3 hour event. Assuming that the least expensive attorney at Johnson & Weaver (who charges $310 per hour) attended these two events, they together result in a bill of $15,913, which the plaintiffs ask the Court to multiply in light of the "success" achieved. These requests are unsupportable and must be denied.

### 5. Conclusion

The plaintiffs' request for fees is flawed in a number of ways, any one of which would justify a denial of all fees. When counsels' excesses are viewed cumulatively, they demonstrate that the request for fees is unreasonable and inequitable. The Court therefore denies the request for an award of attorneys' fees.

B. <u>Plaintiffs Cannot Recover Attorneys' Fees under Delaware's Corporate Benefit Doctrine</u>

Even if the plaintiffs had provided satisfactory fee documentation, they still could not recover their attorneys' fees because they do not meet the requirements of Delaware's corporate benefit doctrine.

### 1. Applicable Law

The parties agree that, under federal law, the plaintiffs must be denied attorneys' fees because the Private Securities Litigation Reform Act ("PSLRA") amended the Securities and Exchange Act of 1934 to prevent the award of attorneys' fees except where counsel's efforts

have led to monetary relief that is "actually paid to the class" of claimants. 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest *actually paid to the class*.") (emphasis added). In this action, plaintiffs have not received a monetary judgment, so federal law clearly precludes them from seeking attorneys' fees based on alleged Securities and Exchange Act violations.

The plaintiffs, however, also seek attorneys' fees and expenses due to the Massey corporate directors' alleged violations of their fiduciary duties under Delaware common law. The parties agree that Delaware law—specifically the corporate benefit doctrine—governs the fee request.

### 2. *Additional Disclosures for which the Plaintiffs Claim Credit*

The plaintiffs claim that they are entitled to attorneys' fees because their efforts led to additional material disclosures in Massey's April 29, 2011 final proxy statement that were originally omitted from the March 17, 2011 preliminary proxy statement. While acknowledging that their lawsuit was mooted by the disclosures in the definitive proxy statement, they nevertheless claim to deserve attorneys' fees. Under the corporate benefit rule, a court may award attorneys' fees and expenses even when a corporate defendant moots one or more claims by satisfying the plaintiff's demands. A claim for fees must satisfy three conditions to justify such an award: (1) the suit was meritorious when filed; (2) the action producing the corporate benefit was taken by the defendant prior to a judicial resolution, and; (3) the resulting corporate benefit was causally related to the lawsuit. *United Vanguard Fund, Inc. v. TakeCare Inc.*, 693 A.2d 1076, 1079 (Del. 1997) (citing Allied Artists Pictures Corp. v. Baron, 413 A.2d 876, 878 (Del. 1980).

When all these conditions are met, the burden shifts to the defendant to show that the lawsuit did not cause the benefit ultimately obtained. *Id.* at 1080. In all events, the decision whether to award fees lies solely within a court's "sound discretion." *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *7; *In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *3 (Del. Ch. Nov. 27, 1990).

The plaintiffs summarize their nondisclosure allegations and the defendants' responses in the following table, excerpted from their supporting memorandum:

| Material Omission (April 4, 2011) | Supplemental Disclosure (April 29, 2011) |
|---|---|
| The names, backgrounds, and purpose of the Strategic Alternatives Review Committee (¶ 66). | "In connection with Massey's review of its strategic alternatives, Massey's board of directors formed a strategic alternatives review committee to consider and assess Massey's strategic alternatives, including the proposed merger." (p. 15).<br><br>". . . unanimously resolved to establish a strategic alternatives review committee consisting of Adm. Inman, Mr. Gabyrs [*sic*] and Mr. Phillips . . ." (p. 71).<br><br>[Detailed summary of the financial and investment expertise of Defendants Inman, Gabrys, and Phillips.] (p. 72). |
| The scope of Perella's authorization to solicit other proposals (¶¶ 68-69). | "Perella Weinberg was advised that the strategic alternatives review committee was open to receiving and considering expressions of interest from any and all parties that contacted Perella Weinberg regarding a potential business combination with Massey." (p. 73).<br><br>[Summary of a November 23, 2010 conversation between Defendant Phillips and Perella regarding] "Company D, which had recently contacted representatives of Perella Weinberg to express interest in a potential business combination with Massey." (p. 75). |
| Whether the Strategic Alternatives Review Committee and Perella reviewed the same Massey future projections in their analyses (¶¶ 70-71). | "Estimates of unlevered free cash flows used for [Perella's] analysis were based on the Internal Massey Forecasts and certain assumptions made by Perella Weinberg." (p. 105). |

| | |
|---|---|
| What Don Blankenship meant by "other factors" Alpha should consider in a potential business combination (¶¶ 72-73). | ". . . Alpha requested an explanation of the "other factors" that would influence Massey board of directors' decision so that Alpha could seek to address them.<br><br>". . . Mr. Blankenship responded in a letter to Alpha that . . . his previous reference to "other factors" conveyed the principle that any proposed business combination would be evaluated as a total package." (pp. 68-69). |
| Why Don Blankenship abruptly resigned as CEO during negotiations for a business combination he steadfastly opposed (¶¶ 74-76). | "During the summer and fall of 2010, Mr. Blankenship had informal discussions with certain members of Massey's board of directors as he contemplated retiring, having served as Chairman of the Board and Chief Executive Officer of Massey for over a decade. During this same time frame, as Massey's board of directors took into consideration the environment in which Massey found itself and as it reflected upon Massey's future prospects as a stand alone company, the board of directors assessed whether Mr. Blankenship as Chairman of the Board and Chief Executive Officer provided the most viable option for Massey going forward. In connection with these discussions, Mr. Blankenship elected to submit his resignation to Massey's board of directors." (p. 76). |
| What Defendant Inman meant by the "key operators" Alpha should recognize in a potential business combination, and whether this consideration was a factor in the Individual Defendants' decision to approve the Proposed Merger (¶ 77). | "Although it was not a factor in the Massey board of directors' evaluation of a potential business combination with Alpha, Adm. Inman also indicated that there were several key operators running Massey mines who were very talented and that Alpha would be well served to recognized their talent and consider appropriate positions for them at Alpha if a business combination were consummated." (p. 70). |
| Which stockholders pressed for certain corporate governance changes, why they pressed for these changes, and whether these changes were enacted independent of the Proposed Merger (¶¶ 78-79). | "Certain stockholders, many of which represented pension funds, had been in contact with Massey following the 2010 annual meeting of stockholders regarding proposals for corporate governance reforms supported by RiskMetrics. . . This review of Massey's corporate governance was conducted independently of the strategic review process." (p. 71). |

15

| | |
|---|---|
| What the Individual Defendants meant by employing a process designed to "maximize[] certainty of closing" (¶¶ 80-81). | "The independent directors of Massey stated that, if Massey chose to pursue a strategic transaction that would maximize stockholder value, management and Massey's advisors would need to employ a process that would also maximize the certainty of closing (including with respect to requisite antitrust and stockholder approvals and the availability of financing), while minimizing the risks to Massey's stockholders of premature public disclosure." (p. 72). |
| Whether Perella conducted a comparable companies analysis, and if so, the details and results of this analysis (¶ 87). | "Perella Weinberg performed a comparable company analysis, which is designed to provide an implied value of a company by comparing it to similar companies." (p. 106).<br><br>[Detailed summary of Perella's comparable company analysis, including a list of the companies used and the financial conclusions drawn.] (pp. 106-07). |

(Pl's Mem. Supp. Mot. for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards 4–6.) On the basis of the foregoing disclosures, the plaintiffs claim that they should receive $900,000 in attorneys' fees plus incentive awards. A review of their request under the three-part test outlined above shows that the plaintiffs are not entitled to recover attorneys' fees.

The first problem with the plaintiff's request is that some of the "disclosures" for which the plaintiffs claim credit were already included in the very first proxy, and, therefore, could not have been "caused" by the plaintiffs' efforts. The following chart summarizes these pieces of information:

| Material Omission Alleged in Amended Complaint (April 4, 2011) | Disclosure Already Included in March 17 Draft Preliminary Proxy (March 17, 2011) |
|---|---|
| Names of members and purpose of the Strategic Alternatives Review Committee (the "Committee") | "In connection with Massey's review of its strategic alternatives, Massey's board of directors formed a strategic alternatives review committee to consider and assess Massey's strategic alternatives, including the proposed merger" (pp. 15, 114).<br>". . . unanimously resolved to establish a strategic alternatives review committee consisting of Adm. Inman, Mr. Gabrys and Mr. Phillips . . ." (p. 68). |
| Whether the Committee and Perella Weinberg reviewed the same Massey future projections in their analyses | "Estimates of unlevered free cash flows used for [Perella Weinberg's] analysis were based on the Internal Massey Forecasts and certain assumptions made by Perella Weinberg." (p. 100). |

16

| What the Individual Defendants meant by employing a process designed to "maximize[ ] certainty of closing" | "The independent directors of Massey stated that if Massey chose to pursue a strategic transaction, management and Massey's advisors would need to employ a process that maximized certainty of closing (including with respect to requisite antitrust and stockholder approvals and the availability of financing), while minimizing the risks to Massey's stockholders of premature public disclosure" (p. 68) |
| --- | --- |
| Whether Perella Weinberg conducted a comparable companies analysis | Perella Weinberg "compared the financial performance of [Massey] and [Alpha] with that of certain publicly-traded companies which [Perella Weinberg] believe[d] to be generally relevant" (D-2). |

(Defs.' Mem. Opp. Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards 16–17.) The plaintiffs cannot collect attorneys' fees for obtaining information that was already in the initial proxy statement.

The plaintiffs put great weight on the disclosure of the Perella Weinberg comparable companies analysis, but even the description of the analysis that the defendants subsequently added to the body of the proxy statement is less earth-shattering than the plaintiffs would have the Court believe. As an initial matter, the preliminary proxy included a reference to the comparable companies analysis as part of Perella Weinberg's fairness opinion, which was attached in full to the proxy itself. As a result, far from failing to disclose the comparable companies analysis, Massey's preliminary proxy indicated that it had in fact been done. More importantly, all that Delaware law requires is a "fair summary" of the work done by the financial advisor, not a "'play-by-play' description of merger negotiations." *In re Ness Technologies, Inc. S'holders Litig.*, 2011 WL 3444573, at *4 (Del Ch. Aug. 3, 2011) (citing *Skeen v. Jo-Ann Stores, Inc.*, 1999 WL 803974, at *7 (Del. Ch. Sept. 27, 1999), *aff'd*, 750 A.2d 1170 (Del. 2000)). In *Ness*, the plaintiffs also wanted additional details about the comparable companies analysis— specifically, the reasons why different companies were selected and information regarding how the financial advisors arrived at the multiples used for those comparable companies. But the Delaware Court of Chancery rejected these and other nondisclosure claims because the plaintiffs

failed to show their significance to a reasonable decision-maker. *See id.* at *3–4. The same outcome is appropriate in this case.

The Court has no reason to believe that Massey's proxy statement failed to meet the "fair summary" standard to which Delaware courts have closely hewed. Indeed, the plaintiffs are especially hard pressed to contest this issue when the complete Perella Weinberg fairness opinion was attached to the proxy itself.[3] *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *3 & n. 14 (Del. Ch. Nov. 1, 2007) (rejecting a preliminary injunction to block a proposed merger when "the actual fairness opinion itself [was] also attached to the definitive proxy statement as an exhibit"). The situation might be different if the plaintiffs could show that the later, more detailed description of the comparable companies analysis revealed the earlier citation in the fairness opinion to be misleading in some manner. *Id.* at *3 (discussing *In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171, 195–96 (Del. Ch. 2007)). But in the absence of such a showing, this Court must not impose a "checklist" approach on the defendants. *Id.* ("[T]here is no 'checklist' of the sorts of things that must be disclosed relating to an investment bank fairness opinion. . . ."). Consequently, the defendants' initial omission of the comparable companies analysis from the body of the preliminary proxy statement does not automatically entitle the plaintiffs to attorneys' fees.

---

[3] Under Delaware law, the fairness opinion itself need not be extensive, volunteer a position on the financial wisdom of a deal, or meet a certain page-length requirement. A "bare bones fairness opinion is typical of such opinions, in that it simply states a conclusion that the offered Merger consideration was 'fair, from a financial point of view, to the shareholders,' but plainly does not opine whether the proposed deal is either advisable or the best deal reasonably available. *In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171, 205 (Del. Ch. 2007).

### 3. Whether Corporate Benefit was Causally Related to the Lawsuit

Some of the disclosures in the final proxy statement were made not because of the plaintiffs' efforts but rather because the Securities and Exchange Commission requested them. The plaintiffs cannot meet the causation prong because the SEC's request was a valid, independent reason for certain disclosures' being made. The Delaware Court of Chancery has previously determined that a defendant may rebut a presumption of causation by the plaintiffs by showing that the SEC has requested the same information. *In re Sauer-Danfoss, Inc. S'holders Litig.*, 2011 WL 2519210, at *8 (Del. Ch. May 3, 2011). In *Sauer-Danfoss*, a group of plaintiffs demanded disclosure of the selection criteria for the financial advisor's choice of companies for the comparable companies analysis, but the SEC also wrote the company a letter requesting a more thorough discussion of the same. *Id.* at *7. The court thus had to determine how to allocate credit for the additional information in the defendants' amended statement. The judge wrote, "I need not consider whether the defendants have sufficiently rebutted the presumption of causation by demonstrating that they promulgated [an amendment] in response to the SEC comment letter. *A strong argument has been made that they did.*" *Id.* at *8 (emphasis added). For this reason, this Court shall deny attorneys' fees to the plaintiffs when the defendants can show that the SEC requested the same information as the plaintiffs.

The following table shows which information should be credited to the SEC's request rather than to the plaintiffs' efforts:

| Material Omission Alleged in Amended Complaint (April 4, 2011) | SEC Comment Letter Request (April 8, 2011) | Alleged Supplemental Disclosure(s) in Definitive Proxy (April 29, 2011) |
|---|---|---|
| Backgrounds of the members of the Committee | "Please enhance your disclosure to discuss why each member was selected to serve on the Committee" (p. 3). | Explanation of why Inman, Gabrys, and Phillips were selected to serve on the Committee, with a description of their experience and expertise ("Adm. Inman was selected to serve on the [Committee] because of . . ." (72). |
| What Don Blankenship meant by "other factors" Alpha should consider in a potential business combination | " . . . [D]escribe the 'other factors' in addition to price that were considered in determining whether or not a potential business combination was in the best interests of Massey stockholders" (p. 2). | ". . . Alpha requested an explanation of the 'other factors' that would influence Massey board of directors' decision so that Alpha could seek to address them . . . Mr. Blankenship responded in a letter to Alpha [that] . . . his previous reference to 'other factors' conveyed the principle that any proposed business combination would be evaluated as a total package." (pp. 68-69). |
| Which stockholders pressed for certain corporate governance changes, why they pressed for these changes, and whether these changes were enacted independent of the Proposed Merger | ". . . [E]xplain when and why the discussions with 'certain stockholders' commenced, identify these shareholders and clarify the nexus of the reforms adopted at the October 6 meeting to the discussions with Alpha" (p. 3). | "Certain stockholders, many of which represented pension funds, had been in contact with Massey following the 2010 annual meeting of stockholders regarding proposals for corporate governance reforms supported by RiskMetrics. . . [Description of corporate governance review] . . . This review of Massey's corporate governance was conducted independently of the strategic review process" (p. 71). |

(Defs.' Mem. Opp. Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards 17–18.)   These three disclosures, the defendants contend, would have occurred regardless of the plaintiffs' efforts.   Consequently, the plaintiffs should not be awarded attorneys' fees on their basis.

The Court agrees that the SEC's comment letter could just as easily have solicited the foregoing disclosures, for which the plaintiffs now claim responsibility.   Though the precise phrasing of the requests might have differed slightly, in substance, they were effectively the same.   The Court will therefore deny attorneys' fees for failure to demonstrate causation of the "resulting corporate benefit" in these three cases. *United Vanguard Fund*, 693 A.2d at 1079.

#### 4. *Whether the Remaining Disclosures Meet the Materiality Standard*

The plaintiffs do identify a few disclosures that were genuinely new and for which the SEC was definitely not the cause. Unfortunately for the plaintiffs, these claims fail to meet the materiality standard and are therefore not deserving of attorneys' fees. These disclosures include (1) the reason for CEO Don Blankenship's resignation in late 2010, (2) what Defendant Inman meant by "key operators" that he encouraged Alpha to retain post-merger, and (3) whether the Massey Board of Directors authorized Perella Weinberg to receive or solicit business combination proposals in addition to those presented by the Board, or whether it limited the financial advisor to proposals chosen by the Board.

The explanation for Blankenship's resignation is so benign that one cannot conclude it was substantially likely to significantly alter the total mix of information facing shareholders as they voted on the merger proposal.[4] The plaintiffs attempt to gin up controversy by asking "why Don Blankenship abruptly resigned as CEO during negotiations for a business combination he steadfastly opposed." (Pl's Mem. Supp. Mot. for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards 4–6.); (Am. Compl. ¶¶ 74-76.) The final proxy, however, lends no support to the notion that he was locked in a showdown with other Massey executives over the deal and either resigned or was forced out of the company in response. If anything, it suggests

---

[4] The updated proxy stated, "During the summer and fall of 2010, Mr. Blankenship had informal discussions with certain members of Massey's board of directors as he contemplated retiring, having served as Chairman of the Board and Chief Executive Officer of Massey for over a decade. During this same time frame, as Massey's board of directors took into consideration the environment in which Massey found itself and as it reflected upon Massey's future prospects as a stand alone company, the board of directors assessed whether Mr. Blankenship as Chairman of the Board and Chief Executive Officer provided the most viable option for Massey going forward. In connection with these discussions, Mr. Blankenship elected to submit his resignation to Massey's board of directors." (Pl's Mem. Supp. Mot. for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards 5.)

that he was already considering retirement, and the proposed merger provided him with the right opportunity to make his exit after a long tenure as CEO.

Even if Blankenship did have misgivings about the deal, "Delaware law does not require that a fiduciary disclose its underlying reasons for acting." *In re Sauer-Danfoss, Inc. S'holders Litig.*, 2011 WL 2519210, at *12 (Del. Ch. May 3, 2011) (citing *Newman v. Warren*, 684 A.2d 1239, 1245–46 (Del. Ch. 1996)). *Newman* is precisely on point, for in that case a holdout shareholder also demanded to know why one of the company's directors opposed further negotiation with the acquirer. *Newman*, 684 A.2d at 1240. The Chancellor, however, held that if the "board or corporation . . . choose[s] to state reasons for a board recommendation," "the statement of those reasons must, of course, be true and not misleading." But it "does not . . . require in addition that individual directors state (or the corporation state for them) the grounds of their judgment for or against a proposed shareholder action. . . ." *Id.* at 1246 (citations omitted). This Court does not see why the rule should be any different for the CEO of a company, as opposed to a director.

Here, the plaintiffs cannot argue that the proxy statement contained any misleading information about Blankenship's resignation or otherwise. The plaintiffs also cannot establish that the omitted rationale for Blankenship's retirement was "inconsistent with, or otherwise significantly differ[ed] from, the disclosed information." *Skeen*, 750 A.2d at 1174. It would not, therefore, have made the deal either significantly more attractive or less attractive to a reasonable shareholder. The Court, in its discretion, will deny attorneys' fees to the plaintiffs for this disclosure.

The next piece of information absent from the preliminary proxy was what Defendant Inman meant by "key operators" that he encouraged Alpha to retain post-merger.   No

information in the preliminary proxy was either "misleading," "inconsistent with," or "significantly differ[ent]" from what was ultimately included in the final proxy.   The proxy stated:

> *Although it was not a factor in the Massey board of directors' evaluation of a potential business combination with Alpha*, Adm. Inman also indicated that there were several key operators running Massey mines who were very talented and that Alpha would be well served to recognize their talent and consider appropriate positions for them at Alpha if a business combination were consummated.

(Pl's Mem. Supp. Mot. for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards 5 (emphasis added).)   In other words, "key operators" were literally just mine "operators," and despite their worth, they unsurprisingly played an insignificant role in the negotiation of a $7.1 billion merger.   This disclosure likewise does not meet the materiality standard and does not merit an award of attorneys' fees.

The final issue is whether the Massey Board of Directors authorized Perella Weinberg to receive or solicit business combination proposals in addition to those presented by the Board, or whether it limited the financial advisor to proposals chosen by the Board.   The defendants offered the following new information in reply: "Perella Weinberg was advised that the strategic alternatives review committee was open to receiving and considering expressions of interest from any and all parties that contacted Perella Weinberg regarding a potential business combination with Massey." (Pl's Mem. Supp. Mot. for Attorney's Fees, Reimbursement of Expenses, and Incentive Awards 5.)   The defendants also disclosed that a discussion that took place in November 2010 with a certain "Company D" regarding "a potential business combination with Massey."   (*Id.*)    Again, neither of these pieces of information could be considered material in the context of what was already known.   The outcome might be different if it turned out that the financial advisor was actually restricted to entertaining offers from

companies handpicked by the Board of Directors. Under those circumstances, telling shareholders that it had appointed the Strategic Alternatives Review Committee of its Board of Directors to analyze options would have been misleading, for it would have omitted a critical detail about the range of potential merger options.

But that was not the case. The financial advisor was enabled to hear offers from any and all parties, and it did, in fact, receive interest from at least one other company. That the defendants did not initially mention this fact is of no consequence, particularly when Alpha was making an attractive offer of more than $69 per Massey share. When it comes to alternatives, "Delaware law does not require management to discuss the panoply of possible alternatives to the course of action it is proposing." *In re 3COM S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (citations omitted). For this reason, though the plaintiffs might have liked hearing about "Company D," it was hardly necessary to disclose the conversation. The plaintiffs again fail to meet the materiality standard necessary for attorneys' fees.

In sum, none of the disclosures for which the plaintiffs can take credit truly ensured that "that Massey's shareholders [had] sufficient information to independently evaluate whether Massey's directors fulfilled their roles as fiduciaries." (Am. Compl. 20.) The only reason they take on importance for the plaintiffs is because they practically assume that the Massey Directors were acting in bad faith—serving only their "self-interest" rather than "exercis[ing] their fiduciary duties to obtain a transaction which is in the best interests of the Company's shareholders." (Am. Compl. 20, 31–32.) Having come to this conclusion, innocuous terms like "key operators" and "maximize[ ] certainty of closing," which most shareholders would have breezed past, suddenly appeared dubious. But the legal standard requires consideration of a "reasonable" shareholder, not a mistrustful one, and the plaintiffs have done nothing to show that

24

the Directors needed to dispel their suspicions in the first place. *Skeen*, 750 A.2d at 1173 ("Unsupported conclusions and speculation are not a substitute for facts.").

The plaintiffs' alleged corporate benefit is unquestionably weak compared to other cases in which plaintiffs managed to secure changes to a proxy statement and got attorneys' fees as a result. *See, e.g.*, *In re BEA Systems, Inc. v. S'holders Litig.*, 2009 WL 1931641 (Del. Ch. June 24, 2009) (awarding $81,297 in fees). In *BEA Systems*, the Court of Chancery granted the plaintiff less than one-quarter of its requested award, and there the results obtained were "two changes to [the defendant's] proxy materials to deal with *misstatements* pointed out in the complaint." *Id.* at *1 (emphasis added). Even with these error corrections, the Court called the benefit "unmistakably modest." *Id.* In this case, by contrast, the additional disclosures obtained by the amended complaint did not correct any misstatements—at best, they provided some marginally "helpful" additional information. It is also important to note that the plaintiffs in *BEA Systems* actually went to the effort of seeking a preliminary injunction, which these plaintiffs did not bother to do. *Id.* The plaintiffs here have expended even less effort and achieved even less remarkable results than the *BEA Systems* plaintiffs.

Similarly, in another case, the plaintiffs' amended complaint led the company to disclose that the special committee found the $18 per share going-offer inadequate and that a better offer would subsequently be sought. *In re Triarc Cos. S'holders Litig.*, 2006 WL 903338, at *2 (Del. Ch. Mar. 29, 2006) (awarding $75,000 in fees for the filing of an amended complaint alone).[5] The plaintiffs' claim in this case is not even in the same ballpark, for no financial benefit of any kind was reaped. *Triarc* also sheds light on the absurdity of the plaintiffs' request of over

---

[5] The Court of Chancery has catalogued and discussed a number of attorneys' fees cases in a recent opinion, displaying even more starkly the weakness of this case. *In re Sauer-Danfoss, Inc. S'holders Litig.*, 2011 WL 2519210 (Del. Ch. May 3, 2011) (summarizing cases in Appendices A–C to the opinion).

$900,000, given that both sets of plaintiffs basically filed amended complaints and then called it quits.[6] In *Triarc*, the Court of Chancery deemed that the requested amount of $250,000 plus expenses was exorbitant based on "the relevant efforts, the benefits thereby obtained, and all other relevant factors, including the contingent nature of the undertaking." *Id.* at *3. In light of that decision, it is appropriate and well within the Court's discretion to deny the plaintiffs' request for attorneys' fees outright.[7]

The plaintiffs do not satisfy the test to recover fees under the corporate benefit doctrine, and this provides an alternative basis to deny their fee petition.[8]

### IV.    Conclusion

For the reasons set forth above, the Court denies the plaintiffs' motion for attorneys' fees.

The Court will enter an appropriate order.

Date: <u>September 10, 2012</u>
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[6] The Court reiterates that the plaintiffs' supposedly exhaustive document review only came *after* the amended complaint had already been filed. So even if they claim that their amended complaint is the reason for valuable disclosures, any work done after its filing is irrelevant.

[7] The plaintiffs' initial claims—that the deal was "structurally" unfair—carry no weight, because the plaintiffs did not prevail on their claim that the deal was unfair. Indeed, the plaintiffs only seek fees because of the "new" disclosures they allegedly brought about.

[8] As noted above, the plaintiffs also request incentive rewards for Mostaed and Perkins. Given the *de minimis* results secured, no incentive award is appropriate.

26